## UNITED STATES FIDELITY & GUARANTY CO. v. HANSEN *et al.*

### VAN WINKLE *et al.* v. SAME.

### AMERICAN SURETY CO. OF NEW YORK v. SAME.

Nos. 2215, 2216, and 2339. Opinion Filed October 13, 1912.

Rehearing Denied December 24, 1912.

(129 Pac. 60.)

1. **GUARDIAN AND WARD** — Sale of Property — Jurisdiction of **Court.** Under the terms of section 7 of the Indian Appropriation Bill of May 27, 1902, c. 888, 32 St. at L. 275, which provides that the interests of minor heirs ''shall be sold by a guardian duly appointed by the proper court,'' the probate courts of Oklahoma territory were the proper courts to appoint guardians of minor heirs of a deceased Indian to whom a patent containing restrictions upon alienation had been issued for lands allotted to him, and had jurisdiction to order a sale of such lands.

2. **INDIANS—Lands—Sale—Trust Fund.** Where allotted lands of a deceased Indian were sold pursuant to the provisions of section 7 of the Indian Appropriation Bill of May 27, 1902, c. 888, 32 St. at L. 275, the purchase price remained a trust fund so long as the United States government retained possession or control, but the trust character ended when the possession and control was relinquished by the government.

3. **SAME.** Under the provisions of said act the government had the option either to retain the control of the purchase money or to end its trusteeship by relinquishing its control, and the Secretary of the Interior had the authority to exercise the option.

4. **GUARDIAN AND WARD—Bonds—Liability of Surety.** The general guardian's bond is liable for the failure of a guardian to pay over the money received for land sold by order of court, although he gave a special bond as required by section 5509, Comp. Laws 1909, before making the sale.

5. **SAME—Validity.** Where the conditions of a guardian's bond recite that the principal had been appointed guardian of a certain minor and showed clearly the purpose for which the bond was given, the bond is valid although the name of the obligee does not appear in the blank left for that purpose in the first paragraph of the bond.

6. **SAME—Release of Bond—Jurisdiction of Probate Court.** A probate court has jurisdiction to release a guardian's bond from liability for defaults occurring after the order is made.

7. **SAME.** Where a guardian's bond has been released by order of court, no recovery can be had thereon for a default of the guardian occurring after the order was made.

(Syllabus by Rosser, C.)

*Error from District Court, Noble County;*
*W. M. Bowles, Judge.*

Action by John A. Hansen, as guardian of Rosa Little Crow, a minor, against R. S. Steele and others. Judgment for plaintiff, and the defendants United States Fidelity & Guaranty Company, American Surety Company, Lee Van Winkle, and Major Moberly, separately, bring error. Affirmed.

*Flynn, Ames & Chambers* and *Russel G. Lowe,* for United States Fidelity & Guaranty Co.

*Geo. A. Matlack,* for Lee Van Winkle and Major Moberly.

*P. W. Cress,* for American Surety Co.

*John Embry* and *Isaac D. Taylor,* for John A. Hansen.

Opinion by ROSSER, C. For convenience the plaintiff below will be referred to here as plaintiff, and the defendants below will be referred to as defendants.

The above styled and numbered causes are appeals taken by the defendants named from a judgment of the district court of Noble county, Okla., rendered on the 4th day of May, 1910, in favor of Rosa Moncooya against R. S. Steele, the United States Fidelity & Guaranty Company, American Surety Company, Lee Van Winkle, and Maj. Moberly. Some time in 1902 R. S. Steele was appointed guardian of Rosa Little Crow, who was a member of the Missouri or Otoe tribe of Indians. About the time of his

appointment he gave a bond as guardian in the penal sum of $500 with the United States Fidelity & Guaranty Company as surety. On the 31st day of July, 1905, he gave an additional bond as guardian in the sum of $800 with the American Surety Company as surety. On the 7th day of August, 1905, he filed another bond in the penal sum of $1,600 with Lee Van Winkle and Maj. Moberly as sureties. On the 24th day of August, 1905, the court made two orders releasing the American Surety Company from further liability on the bond. The minor had no personal property, but she owned some land from which the guardian received some rent. She also had an annuity by virtue of her membership in the Otoe tribe of Indians, and her guardian sold certain lands which she had inherited for the sum of $875. At the end of his guardianship the guardian failed to pay over the money in his hands belonging to her, amounting to over $1,200. John A. Hansen, the original plaintiff in this suit, brought a suit against R. S. Steele, the guardian, and the United States Fidelity & Guaranty Company, the American Surety Company, Lee Van Winkle, and Maj. Moberly, the sureties on his various guardian bonds. Rosa Little Crow became of age and married during the pendency of the action, and the suit proceeded in the name of Rosa Moncooya, as plaintiff. The trial court rendered judgment for the plaintiff against R. S. Steele, Lee Van Winkle, and Maj. Moberly for the amount which he failed to pay over, and against the other two defendants for the amount of the penalty of their respective bonds, and the defendants the United States Fidelity & Guaranty Company, the American Surety Company, Lee Van Winkle and Maj. Moberly filed separate appeals. The three cases are consolidated here and will be considered together.

The grounds relied upon by all the appellants are: (1) That the probate court had no jurisdiction to appoint a guardian of the minor, and that therefore the bonds are void. (2) That the land was a trust estate, subject to the control of the United States, and that the money received for the land was of the same character, and that the trustee, the United States govern-

ment, could not surrender the possession to the guardian so as to make him liable as such. (3) That the general guardian's bond is not liable for the proceeds of the sale of land, for the reason that the special bond given to properly conduct the sale is intended for that purpose. The United States Fidelity & Guaranty Company and the American Surety Company each claim a reversal as to it upon other grounds that will be noticed later.

It is contended that the probate court had no jurisdiction to appoint a guardian because section 12 of the Organic Act of Oklahoma territory (Act May 2, 1890, c. 182, 26 St. at L. 81) only gave jurisdiction over members of the Indian tribes to the district courts. That section is as follows:

"That jurisdiction is hereby conferred upon the district courts in the territory of Oklahoma over all controversies arising between members or citizens of one tribe or nation of Indians and the members or citizens of other tribes or nations in the territory of Oklahoma and any citizen or member of one tribe or nation who may commit any offense or crime in said territory against the person or property of a citizen or member of another tribe or nation shall be subject to the same punishment in the territory of Oklahoma as he would be if both parties were citizens of the United States; and any person residing in the territory of Oklahoma, in whom there is Indian blood, shall have the right to invoke the aid of courts therein for the protection of his person or property, as though he were a citizen of the United States. Provided: That nothing in this act contained shall be so construed as to give jurisdiction to the courts established in said territory in controversies arising between Indians of the same tribe, while sustaining their tribal relations."

There is room for controversy as to whether this section confined the jurisdiction over Indians to the district court. Congress by a later act did so confine it. Act March 3, 1905, c. 1479, 33 St. at L. 1063. But it is not necessary to consider the effect of this section of the Organic Act upon the jurisdiction of the probate courts of Oklahoma territory over the estates of minor Indians. The Organic Act was approved May 2, 1890. At that time the Act of February 8, 1887, entitled "An act to provide for the allotment of lands in severalty to Indians of the

various reservations, and to extend the protection of the laws of the United States and the territories over the Indians, and for other purposes" (Act. Feb. 8, 1887, c. 119, 24 St. at L. 389), sometimes called the "general allotment act," was in force. The portion of section 5 of that act bearing upon the question involved here is as follows:

"That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, that the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made, touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: Provided, that the law of descent and partition in force in the state or territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered, except as herein otherwise provided; and the laws of the state of Kansas regulating descent and partition of real estate shall, so far as practicable, apply to all lands in the Indian Territory which may be allotted in severalty under the provisions of this act."

It will be observed that under this act lands allotted could not be alienated for 25 years. The United States held the lands as trustee for the allottee during this period. The patent in effect designated the allottee as *cestui que trust* but without power of alienation. The Indian Appropriation Bill of May 27, 1902, c. 888, 32 St. at L. 275, gave to the allottee, the *cestui que trust,* a limited power of alienation, subject, however, to the approval of the trustee, the United States government, acting through the Secretary of the Interior. Section 7 of that bill is as follows:

"That the adult heirs of any deceased Indian to whom a trust or other patent containing restrictions upon alienation has been or shall be issued for lands allotted to him may sell and convey the lands inherited from such decedent, but in case of minor heirs their interests shall be sold only by a guardian duly appointed by the proper court upon the order of such court, made upon petition filed by the guardian, but all such conveyances shall be subject to the approval of the Secretary of the Interior, and when so approved shall convey a full title to the purchaser, the same as if a final patent without restriction upon the alienation had been issued to the allottee. All allotted land so alienated by the heirs of an Indian allottee and all land so patented to a white allottee shall thereupon be subject to taxation under the laws of the state or territory where the same is situate: Provided, that the sale herein provided for shall not apply to the homestead during the life of the father, mother or the minority of any child or children."

This is a later act of Congress than the Organic Act. It will not be disputed that, even though the Organic Act prohibited the probate courts from exercising jurisdiction over members of Indian tribes, Congress could have conferred the jurisdiction upon those courts by a later enactment. The question then is whether section 7 of the Appropriation Bill, quoted above, conferred jurisdiction upon the probate courts, or recognized their jurisdiction. The general allotment act was not limited to the Indians in Oklahoma territory. It extended to all Indians in the United States. Section 7 of the Appropriation Bill, being designed to remove some of the restrictions created by the general allotment act, extended in the same way. It was not limited in its effect to one state or to Oklahoma territory. When it provided that lands of minor heirs should be sold only by guardian duly appointed by the "proper court" upon the order of such court, it undoubtedly meant the court having jurisdiction under the laws of the state or territory where the land was situated to appoint guardians and administer the estates of minors. This court in Oklahoma territory was the probate court. It is clear that any other holding would lead to great inconvenience. No other court had the machinery necessary to carry on such business. It is highly probable that in making the requirement that

the sale should be through a guardian it was intended to give the titles thus conveyed the appearance of regularity and stability. If the district courts had taken jurisdiction of that class of guardianships when there was no law of the territory conferring the jurisdiction upon them, and when they did not attempt to exercise it in other cases, it would have resulted in uncertainty and confusion which could not have been otherwise than detrimental to the interest of the ward. The Organic Act of the territory of Oklahoma provided for probate courts, and, while it did not define their jurisdiction, the name indicated that Congress expected that probate jurisdiction would be conferred upon them, and the appointment of guardians for minors is embraced within the term "probate jurisdiction." The Department of the Interior recognized the jurisdiction of the probate court in such cases. The construction of the statute by the officers of the federal government is entitled to consideration; but it is believed there is not much room for construction. The plain language of the statute recognized the jurisdiction of the probate court. It was the only proper court to appoint guardians.

2. The second ground relied upon for a reversal is that, as the United States held the land in trust for the allottee, the money received for the land was impressed with the same trust character as the land, and that the guardian had no right to receive, as guardian, the money paid for the land.

This position, if correct, would not constitute a defense as to the money paid him as rent, nor as to the annuity moneys paid him. The question is as to the proceeds of the land.

The position of the United States government with reference to the lands and moneys of the Indian tribes, such as the Otoes, is frequently described as that of a trustee. This does not mean, however, that the trusteeship of the government has all the incidents of an ordinary trust. The government is a self-appointed trustee, and it has the right to determine when its trust shall end. When the government abdicates its office as trustee, there is no power elsewhere to appoint a new trustee and administer the trust. It has the right to administer the trust as it sees fit and to terminate it when it gets ready. This, of.

course, does not mean that an officer of the government is not governed by law in disposing of Indian lands and paying out the proceeds. When the land belonging to Rosa Little Crow was sold, the government had the right to retain the money derived from the sale and to administer it as a trust estate. It had also the right to discharge itself of the trust by paying the money to her or to her legally appointed guardian, if there was nothing in the law prohibiting it.

The Act of May 27, 1902, quoted above, permitting the sale of the land, was silent as to the disposition of the proceeds. It did require all sales to be approved by the Secretary of the Interior. It was held in *United States v. Thurston County*, 143 Fed. 287, 74 C. C. A. 425, that the Secretary by virtue of the act was vested with authority to regulate the disposition of the proceeds. In that case the money was deposited in a bank in accordance with a requirement of the department, and it was held that the government thereby retained control over it. But the reasoning of the court leads to the conclusion that the government had the option either to retain or relinquish control, and that the Secretary of the Interior had the authority to exercise this option. In the course of the opinion the court said:

"Nor is the complainant without lawful authority to hold these proceeds and to control their disposition in the same way that it held and controlled the lands in trust for the benefit of these Indian heirs. The Act of 1902 authorized these heirs to sell and convey their inherited lands only when the proposed sales were approved by the Secretary of the Interior. It thereby vested in the Secretary plenary power to permit or to forbid the sales proposed. The whole is greater than any of its parts, and includes them all, and the authority to allow or to prohibit proposed sales necessarily included the powers to consider and determine the terms and considerations on which such sales should be approved. By rules and regulations approved October 4, 1902, and amended September 16, 1904, and May 25, 1905, the Secretary provided that owners of inherited lands might be permitted to sell them on condition that they agreed that the proceeds of such lands should be placed in one or more banks, which should furnish satisfactory bonds to guaranty the safety of the deposits, to the credit of each heir in proper proportion, subject to the checks of such heirs only when approved by the

agent or officer in charge of the amounts, not to exceed $10 each in any one month, and subject to their checks for larger amounts only when approved by the agent specifically authorized by the Commissioner of Indian Affairs.   The act of Congress authorizes the Secretary to make these regulations for the purpose of carrying into effect the Act of 1902, and, when made, they had the force of statutory enactments.   Rev. St., secs. 441, 465 (U. S. Comp. St. 1901, pp. 252, 264; *U. S. v. Eaton,* 144 U. S. 688, 12 Sup. Ct. 764, 36 L. Ed. 591; *Wilkins v. U. S.,* 96 Fed. 837, 37 C. C. A. 588.   * * *   The lands and their proceeds, *so long as they are held or controlled by the United States,* and the term of the trust has not expired, are alike instrumentalities employed by it in the lawful exercise of its powers of government to protect, support, and instruct Indians, for whose benefit the complainant holds them, and they are not subject to taxation by any state or county."   (Italics ours.)

This case is relied upon by the defendants as establishing the rule that the proceeds of the sale of the land is impressed with the same trust that existed upon the land.   It does establish that rule, but only so far as the United States retains possession or control.   It also holds that the Secretary has plenary power, and that it is in his discretion whether the trust should be continued or relinquished.   The case of *National Bank of Commerce v. Anderson,* 147 Fed. 87, 77 C. C. A. 259, is also cited to establish the proposition that the money arising from sales remains a trust fund.   The court so holds in that case, and seems to view the regulations of the Secretary of the Interior with reference to the disposition of the proceeds of the sale, as different constructions placed upon the law.   A better view, however, is believed to be that the Secretary considered that he had the right to either relinquish or continue his trust relation to the money received for the land.   The case decided that the money cannot be paid to the allottee or his order until authorized by the Secretary, but does not intimate that the trust continues after the money has been paid over by the authority of the Secretary.

The first regulations promulgated by the Secretary provided that the consideration money must in no case be paid to the grantors; but a certificate from the cashier or other officer of some reputable bank, or, in case there is no bank convenient,

from a United States Indian agent, showing that the stipulated price named in the deed for the land has been deposited in such bank, or with such agent, as the case may be, to be paid to the grantors or their order upon the presentation of the deed duly approved by the Secretary of the Interior or by the President, must accompany such deed. This regulation was in force at the time Rosa Little Crow's land was sold and the money paid to her guardian. Afterward the Secretary made regulations requiring the proceeds to be placed in a bank to be designated by the Commissioner of Indian Affairs, "to the credit of each heir in proper proportions subject to the check of such heirs, or, in case of minors, subject to the check of their recognized guardians, for amounts not exceeding $10.00 in any one month, when approved by the agent or other officer in charge, and only when so approved, and for sums in excess of $10.00 per month upon the approval of such agent only when specifically authorized by the Commissioner of Indian Affairs." This later regulation cannot affect the case at bar, for the reasons that the transactions in this case were had before it was put in force. Among the regulations in force at the time the land was sold and the money paid to the guardian was section 6, which is as follows:

"In all cases the probate judge, or officer having probate jurisdiction, is respectfully requested and urged, in taking the bond of guardian, to require such guardian to give a trust or guarantee company, wherever practicable, as surety."

Under the regulations in force at the time the money was paid to Steele in this case there was no specific reference to guardians, except that they were requested and urged to give bonds with a trust or guaranty company as surety. The only interest the Secretary could have in making such regulations would be to protect the ward from embezzlement or failure to account, and it was evidently contemplated that the guardian would receive the money. It can hardly be contended that after the money had been paid to the grantor, or to his or her guardian, the trust continues. The Secretary permitted the money in this case to be paid to the guardian. This put an end to the trust in the legal sense, and the guardian was required to account just

as he would be for any other character of property. The subsequent regulations promulgated by the Secretary, requiring the money to be deposited in a bank and paid out upon the check approved by an agent or other officer in charge, provided that a greater sum than $10 could be paid upon the approval of the agent when specifically authorized by the Commissioner of Indian Affairs. Even under the regulations as they now exist, should a larger sum be paid than $10 a month, where the record is silent, as it is in this case, as to whether or not the Commissioner of Indian Affairs authorized the payment, it would be presumed that he did, and the guardian would be required to account.

3.   The next contention of the defendants is that the bonds sued on are general guardian's bonds and are not liable for the proceeds of sales of real estate. It is their contention that a general guardian's bond cannot be held liable for the proceeds of sales of real estate because the statute (section 5509, Comp. Laws 1909) also requires every guardian authorized to sell real estate to give bond conditioned to sell the land in the manner and to account for the proceeds of the sale as provided for in articles 8 and 15 of Comp. Laws 1909. A number of cases are cited which seem to support this contention. They have not been carefully examined in connection with the statutes of the respective states in which they are decided. If predicated upon a statute the same in substance as ours, this court would not follow them, while, if on a different statute, they are not in point. Section 5479, Comp. Laws 1909, requiring guardians to make bonds, is as follows:

"Before the order appointing any person guardian under this article takes effect, and before letters issue, the judge must require of such person a bond to the minor, with sufficient sureties, to be approved by the judge, and in such sum as he shall order, conditioned that the guardian will faithfully execute the duties of his trust according to law; and the following condition shall form and constitute a part of every such bond, without being expressed therein: (1) To make an inventory of all the estate, real and personal, of his ward that comes to his possession or knowledge, and to return the same within such time as the judge may order. (2) To dispose of and manage the estate according to law and for the best interest of the ward, and faithfully to

discharge his trust in relation thereto, and also in relation to the care, custody and education of the ward. (3) To render an account on oath of the property, estate and moneys of the ward in his hands, and all proceeds or interest derived therefrom, and of the management and disposition of the same, within three months after his appointment, and at such other times as the court directs; and at the expiration of his trust to settle his accounts with the county judge, or with the ward, if he be of full age, or his legal representative, and to pay over and deliver all the estate to the person who is lawfully entitled thereto. Upon filing the bond, duly approved, letters of guardianship must issue to the person appointed. In form the letters of guardianship must be substantially the same as letters of administration; and the oath of the guardian must be indorsed thereon that he will perform the duties of his office, as such guardian, according to law."

The guardian is required in paragraph 1 of the section to make an inventory of all the estate, real and personal. By paragraph 2 he is required to dispose of and manage the estate according to law. By paragraph 3 he is required to pay over and deliver all the estate, moneys, and effects remaining in his hands, or due from him, etc. Nothing can be clearer than the language used and no satisfactory reason can be given for excepting from the liability of the bond the proceeds of sale of real property. Its language covers every duty of the guardian concerning all the property of the ward. Section 5509 does not change the liability of the sureties on a general bond. It merely, as an additional precaution and protection, requires the additional bond. It was enacted for the protection of the wards, and not for the purpose of relieving sureties on a general bond from liability which the law fixes thereon. This precise question was before this court recently in the case of *Southern Surety Co. v. Burney,* 34 Okla. 552, 126 Pac. 748, and in that case Robertson, C., decided that the sureties upon the general guardian's bonds were liable for the proceeds of sales of real estate. A number of authorities are cited in the opinion which supports the doctrine there announced, and the case is here followed.

The defendant the United States Fidelity & Guaranty Company in its brief contends that it is not liable on its bond, for the

reason that no obligee is named in the bond. The name of the obligee is left blank, but the condition of the bond recites that R. S. Steele has been appointed guardian of Rosa Little Crow, and shows that the bond is to secure the faithful performance of his duties as guardian. The failure to formally designate the obligee did not vitiate the bond. The recitals in the conditions made it clear for whose benefit the bond was given. The law provided that the bond must be given to the minor, and, when the bond clearly showed that it was given to secure the faithful performance by R. S. Steele of his duties as guardian of Rosa Little Crow, the surety could not escape liability because the minor's name was not written in the first blank left for that purpose.

As said by the Supreme Court of New Hampshire in *Judge v. Ordway,* 23 N. H. 198:

"We notice the kind of bond the law authorizes the judge to receive, and requires him to exact. Thus we know what the parties must have intended, much better than by any rules of construction; and we are bound to give the language used such construction as will give effect to the intention of the law, and of the court, and of the parties concerned, if it can be done consistently with the language used, however unskillfully the instrument may have been drawn, and though some of the expressions used might even be understood to import a different meaning, if they were to be construed merely by the ordinary rules of interpretation, and without that same light which the statute affords us as to the intention of the parties and of the probate court."

In *State v. Wood,* 51 Ark. 205, 10 S. W. 624, where a county treasurer's bond failed to name the obligee, it was held that a recovery could be had upon the bond. In the course of the opinion Cockrill, C. J., said:

"It was never regarded as necessary that the obligee in a bond should be specified *eo nomine.* It was enough if he was so designated that he might be certainly ascertained. *Preston v. Hull,* 12 Am. Law Reg. [N. S.] 699, and note; *Fellows v. Gilman,* 4 Wend. [N. Y.] 419. * * * The condition which shows the design of the bond is the important requirement in such an undertaking, and when that is properly framed, as it is conceded it was in this instance, 'the naming of an obligee,' as Judge Cooley expressed it in delivering the judgment for the

Supreme Court of Michigan, 'the merest formality possible, so that if the instrument omitted to name one  *  *  *  the substance of the undertaking would remain.' *Bay County v. Brock,* 44 Mich. 45 [6 N. W. 101]. The substance remaining, how can the bond be void for informality?"

In *County of Bay v. Brock,* 44 Mich. 45, 6 N. W. 101, it is held that the insertion of the wrong name as obligee did not vitiate the bond. In the course of the opinion the court said:

"The purpose of the bond is sufficiently indicated by the condition. It is to protect and give indemnity to all persons in whose favor a duty may arise, to be performed by the sheriff, and who may be damnified by neglect or failure in performance."

In the case of *Ryndak v. Seawell,* 23 Okla. 759, 102 Pac. 125, the court quoted with approval the following from the case of *Rose v. Winn,* 51 Tex. 545:

"In regard to ordinary bonds, when the intention is manifest from the instrument itself, the court will transpose or reject insensible words and supply accidental words in order to give effect to that intention."

See, also, *Bennehan v. Webb,* 28 N. C. 57; *State v. Martin,* 69 N. C. 175; *Leach v. Flemming,* 85 N. C. 447; *Giles v. Halsted,* 24 N. J. Law, 366, 61 Am. Dec. 668; *Kincannon v. Carroll,* 9 Yerg. (Tenn.) 11, 30 Am. Dec. 391; *Huffman v. Koppelkon,* 8 Neb. 344, 1 N. W. 243.

The American Surety Company further contends that it is not liable for the further reason that the probate court made an order on the 24th day of August, 1905, releasing it from further liability. The bond executed by the American Surety Company as surety was filed and approved August 1, 1905. On the 7th day of August, 1905, the guardian executed another bond with Lee Van Winkle and Major Moberly as sureties, which was intended as a substitute for the bond of the American Surety Company. On the 24th of the same month the probate court entered an order, in which it' was recited that the application of the American Surety Company to be released came on to be heard, and the court having given notice, and it appearing that no injury could result, the court released the American Surety Company from the further liability and required the guardian

to give a new bond, "and that, upon the giving of said new bond by said guardian, the American Surety Company of New York be released and discharged from the bond of said R. S. Steele, guardian, on account of any of his future acts as such guardian." On the same day the court entered another order reciting that the guardian filed his bond in the sum of $1,600 with Van Winkle and Moberly as sureties, and asked that the bond of the American Surety Company be released, that the court approved the new bond, and that the bond filed August 1, 1905, "and the surety thereon, the American Surety Company of New York, is hereby released from further liability thereon from and after this date." The evidence shows that no money was received or paid out by the guardian between the 1st and 24th of August. The statute (section 1866, Wilson's Rev. & Ann. St. 1903; section 5524, Comp. Laws 1909) provides that:

"The judge of the probate court may require a new bond to be given by a guardian whenever he deems it necessary, and may discharge the existing sureties from further liability after due notice given as he may direct, when it shall appear that no injury can result therefrom to those interested in the estate."

This statute gave the authority to release the bond. It is urged that no notice was given or investigation made as to whether injury would result; but the order recites that there were both, and the recitals are conclusive as against a collateral attack. The testimony offered to impeach the record was clearly incompetent under the pleadings and issues in the case.

The suit on the bond is not based on any defalcation of the guardian during the term of his guardianship. It is based on his failure to pay over on the expiration of his term. The dereliction of the guardian having occurred long after the American Surety Company was discharged, it cannot be held liable.

Under a somewhat similar statute, the power of the probate court to discharge sureties has been upheld in a number of states. See *Spencer v. Houghton,* 68 Cal. 82, 8 Pac. 679; *Jamison v. Cosby,* 11 Humph. (Tenn.) 273; *Wilborne v. Commonwealth,* 28 Ky. (5 J. J. Marsh.) 617; 21 Cyc. 235.

The defendant in error urges that the guardian and his bondsmen are estopped to deny his liability for the money re-

ceived by him as such, regardless of the other questions involved in this case. The view that is taken of the question renders it unnecessary to decide the question of estoppel.

The judgment of the lower court should be affirmed as to all the defendants except the American Surety Company. As to that company the judgment should be reversed and here rendered in its favor.

By the Court: It is so ordered.