**GRAY et al. v. McKNIGHT et al.**

No. 8755—Opinion Filed June 24, 1919.

Rehearing Denied Sept. 9, 1919.

(Syllabus by the Court.)

1. **Indians — Allotment — Descent — Illegitimates.**

Under Act Cong. Feb. 28, 1891, 26 Stat. 794, c. 383, sec. 5 (U. S. Comp. St. sec. 4222), providing that, for determination of descent of allotted lands, whenever a male and female Indian shall have cohabited as husband and wife, their issue for such purpose shall be regarded as legitimate, and that every other Indian child, otherwise illegitimate, shall for that purpose be taken to be the legitimate issue of the father, the illegitimate child of an allottee by an Indian woman, whether born as the result of cohabitation in accordance with Indian customs or not, is entitled to inherit rights in his father's allotment as his heir.

2. **Same — Allotment—Descent — Estate of Heirs.**

John Nestell, a white man, by the provisions of the Kiowa, Comanche, and Apache Agreement (31 Stat. 676, c. 813) was awarded all the benefits of land and money conferred by the agreement the same as members by blood of one of said tribes. Under the agreement, after an allotment was selected and approved by the Secretary of the Interior, the title thereto was to be held in trust for the allottee for a period of 25 years in the time and manner provided by Act Feb. 8, 1887, c. 119, 24 Stat. 388, and the act amendatory thereof approved February 28, 1891 (26 Stat. 794, c. 383), and at the expiration of said period the title was to be conveyed in fee simple to the allottee, or his heirs, free from all incumbrances. The said John Nestell died in August, 1902, prior to the issuance of final patent, but subsequent to the issuance of the trust patent. The Indian Appropriation Act approved March 3, 1903 (32 Stat. 1008, c. 994), authorized and directed the Secretary of the Interior to issue a patent in fee to several designated persons, including John Nestell, and further provided that "all restrictions as to the sale, incumbrance, or taxation of said lands are hereby removed." On June 17, 1903, the Secretary of the Interior issued a patent to the heirs of John Nestell without naming them. Held, that said heirs took the estate by inheritance, and not by direct grant from the United States.

3. **Same—Determination of Heirship—Power of County Court.**

County courts of this state, in the exercise of their probate jurisdiction, are authorized to determine who, in fact, are the heirs of a deceased person for the purpose of distributing the estate of the decedent, except in those cases involving Indian allotments where Congress has not relinquished its supervisory control over the same or delegated such authority to said courts, and after the death of an allottee in the Kiowa, Comanche, and Apache reservation under a trust patent, and during the trust period, county courts are without jurisdiction to determine who in fact are the heirs of said decedent; but after the issuance of patent, and the removal of restrictions, and the withdrawal of federal supervision, and where the question of heirship has not been determined by the Secretary of the Interior during the trust period, the county court having jurisdiction of the administration of the estate of the deceased allottee is authorized to determine, under the state law, who in fact are the heirs of the

decedent, and to distribute his estate accordingly.

### 4. Executors and Administrators—Distribution Decree—Collateral Attack.

A decree of distribution of a county court cannot be successfully attacked in a collateral proceeding for mere irregularities in the proceedings in the county court.

### 5. Same—Final Distribution.

Under section 6463, Rev. Laws 1910, upon the final settlement of an account of the executor or administrator, or at any subsequent time, upon the application of the executor or administrator, or of any heir, legatee, or devisee, the court must proceed to distribute the residue of the estate of the decedent over which it is exercising jurisdiction.

### 6. Judgment — Validity—Fraud — Perjured Testimony.

It is not every kind of fraud that will vitiate a judgment in an independent proceeding, for to investigate the character of the testimony upon which a judgment was obtained would be to retry the issues submitted in the trial at which the judgment was obtained, and the result would be that there would be no end to the litigation. The fraud which will vitiate a judgment in an independent proceeding must be extraneous to the issues and such as would deprive the party of a fair opportunity to present his case. Brown et al. v. Trent et al., 36 Okla. 239, 128 Pac. 895.

### 7. Appeal and Error—Ejectment—Review of Evidence.

In an action for the recovery of real property tried to the court without a jury, the findings of the court upon disputed questions of fact will be given the same weight and effect as the verdict of a jury, and, where reasonably supported by the evidence, will not be disturbed on appeal.

Error from District Court, Caddo County; Will Linn, Judge.

Action by Sarah B. Gray, as administratrix of the estate of Mary B. Gray, deceased, and others, against L. E. McKnight and others. From judgment for defendants, plaintiffs bring error. Affirmed.

H. E. Asp, C. H. Carswell, and Blake & Boys, for plaintiffs in error.

A. J. Morris, for defendants in error McKnight and Haskett.

RAINEY, J. This case involves the title to an allotment of land made under the Kiowa, Comanche, and Apache Agreement (31 Stat. 676, c. 813). John Nestell was a white man, and under the said agreement he, with certain other named persons, were awarded all the benefits of land and money conferred by the agreement, the same as members by blood of one of said tribes. The agreement provided that, when allotments of land were selected and approved by the Secretary of the Interior, the title thereto should be held in trust for the respective allottees for a period of 25 years "in the time and manner and to the extent provided for in the act of Congress entitled 'An act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and territories over the Indians, and for other purposes,' approved February 8, 1887 [24 Stat. 388, c. 119], and an act amendatory thereof, approved February 28, 1891 [26 Stat. 794, c. 383]. And at the expiration of the said period of twenty-five (25) years the titles thereto shall be conveyed in fee simple to the allottees or their heirs, free from all incumbrances." The act of February 8, 1887, is commonly called the General Allotment Act. John Nestell died in August, 1902, prior to the issuance of final patent, but subsequent to the issuance of the trust patent. The Indian Appropriations Act, approved March 3, 1903 (32 Stat. 1008, c. 994), authorized and directed the Secretary of the Interior to issue a patent in fee to several designated persons, including the said John Nestell, and provided that "all restrictions as to the sale, incumbrance, or taxation of said lands are hereby removed." The Allotment Act of February 8, 1887, supra, contained the following provisions:

"Upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus allotted, for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided, that the President of the United States may in any case in his discretion extend the period. And if any conveyance shall be made of the lands set apart and allotted as herein provided, or any contract made touching the same, before the expiration of the time above mentioned, such conveyance or contract shall be absolutely null and void: Provided, that the law of descent and partition in force in the state or territory where such lands are situate shall apply thereto after patents therefor have been executed and delivered, except as here-

in otherwise provided; and the laws of the state of Kansas regulating the descent and partition of real estate shall, so far as practicable, apply to all lands in the Indian Territory which may be allotted in severalty under the provisions of this act."

John Nestell, at the time of his death, was possesed of cetrain personal property, and he left a will devising his estate to Callie Ryan. An executor was appointed by the probate court of Caddo county. Prior to the issuance of patent the executor did not claim that he had the right, nor did he attempt, to take possession of the allotment in controversy, but subsequent to the issuance of patent did for several years collect the rents therefrom. On the 21st day of May, 1907, the executor filed his final account, and an order was entered directing him to pay certain allowed claims out of the funds of the estate, and, upon filing his receipts, that he be discharged. An appeal was taken from this order, which appeal was dismissed by the district court on the 19th day of June, 1909. The case was then neglected, and no order was made transmitting it back to the county court until April 23, 1910, when the order dismissing the appeal was filed in the county court. The appearance docket of the probate court shows that on May 5, 1910, another order was entered setting a day for settlement of account and issuing notice, etc. On August 19, 1910, an order of discharge, together with a decree of distribution, was entered, distributing the estate to L. E. McKnight and F. L. Haskett, as grantees of Albert Lamar, who was found to be the illegitimate son of John Nestell by an Indian woman, and as such to be his sole heir at law.

Subsequently this action was commenced by the grantees of the brothers and sisters and the descendants of several brothers and sisters of the said John Nestell against L. E. McKnight and F. H. Haskett for the possession of the allotment—it being the contention of the plaintiffs that Albert Lamar was not the child of John Nestell; that if he was found to be the illegitimate child of John Nestell, as contended, he was not an heir to the allotment of the deceased; that the decree of distribution entered by the county court of Caddo county was void for the reason that the court was without jurisdiction to render said decree, and that the said decree of distribution was obtained by fraud.

We will first consider the proposition advanced by plaintiffs in error that Albert Lamar, even though he is an illegitimate child of John Nestell, as contended by defendants in error, is not an heir, and under the law is not entitled to the allotment, of the said John Nestell, deceased. The governing statute is the act amendatory of the act approved February 8, 1887 (26 Stat. 794), which act was approved February 28, 1891; section 5 (U. S. Comp. St. § 4222) thereof being as follows:

"For the purpose of determining the descent of land to the heirs of any deceased Indian under the provisions of the fifth section of said act, whenever any male and female Indian shall have cohabited together as husband and wife according to the custom and manner of Indian life the issue of such cohabitation shall be, for the purpose aforesaid, taken and deemed to be the legitimate issue of the Indians so living together, and every Indian child, otherwise illegitimate, shall for such purpose be taken and deemed to be the legitimate issue of the father of such child."

It is earnestly insisted that under the Oklahoma statute of descent an illegitimate child does not inherit from its father, unless the putative father acknowledges in writing, signing in the presence of competent witnesses, that he is the father of such child. According to the evidence, John Nestell never acknowledged in writing the said Albert Lamar as his child, and it is contended that the act above quoted does not apply to the case at bar, for the reason that John Nestell was a white man, and the act, by its terms, only applied to the heirs of deceased Indians. This identical question has received the consideration of the Supreme Court of Wisconsin in a case entitled In re House's Heirs, 132 Wis. 212, 112 N. W. 27, and also in the case of Smith v. Smith, 140 Wis. 599, 123 N. W. 146, wherein the court held that an illegitimate child of a white father was an heir within the meaning of said act. In the first-named case the court said:

"It is said that the trial court erred in construing that part of these statutes which was enacted for the purpose of determining the descent of these lands to the heirs of any deceased Indian. It was manifestly intended that the word 'heir,' as used in this part of the act, should include the children of Indians coming within the classes specified, namely, first, the children born to 'any male and female Indian [who] shall have cohabited together as husband and wife according to the custom and manner of Indian life.' This class of children are to be 'taken and deemed to be the legitimate issue of the Indians so living together.' The intent of this provision, for the purposes of this act. was evidently to make this class of children, who are legitimate under Indian custom and manner, legitimate within the state or territory where they reside, though the laws of such state or territory might not recognize them as legitimate, because their parents

were not married according to the laws of such state or territory. The other class is comprehended in the phrase immediately following the part last above quoted. It reads: 'And every Indian child, otherwise illegitimate, shall for such purpose be taken and deemed to be the legitimate issue of the father of such child.' It is urged that the trial court's construction, that they formed a class different from the first, which included all the illegitimate children of the father who were not the issue of him and a female cohabiting together as husband and wife according to the custom and manner of Indian life, rendered the previous class an unnecessary one, because this latter class would include all illegitimate children. It is evident that this class of children is constituted of those who are illegitimate according to Indian custom and manner, as well as by the law of the state or territory where they reside, and as such might accordingly not occupy the same status as to the right of inheritance that the first class do, whose legitimacy recognized according to Indian custom and manner is imported into the state or territory where they reside and given effect for the purpose of this act. Recognition of this difference in their status by Indian custom and manner and the law of the state or territory makes the act inclusive of all Indian children not born in lawful wedlock according to the law of the state or territory of their residence. It seems that Congress, in the evident purpose of caring for all Indians as its wards, whether legitimate or illegitimate, framed this statute so as to include all Indian children, legitimate or illegitimate, under the codes of the Indians or of the state or territory where they reside. There is no quetsion under this interpretation of the statute but that all of the children of Thomas House, deceased, are his heirs for the purpose of inheriting the lands allotted to him under the act of Congress. This disposes of the question as to who were his heirs for this purpose, and results in Thomas House Ninham taking the share of his mother, who was one of the children of Thomas House, deceased."

We think the Supreme Court of Wisconsin correctly construed the statute. We have no doubt that, if the said Albert Lamar was the illegitimate son of John Nestell, he would be his sole heir at law.

But there is a serious question in this case. There was admitted in evidence, over the objection of plaintiffs in error, the decree of the county court of Caddo county finding that the said Albert Lamar was the illegitimate son of John Nestell, and that as such he was his sole heir at law, and distributing the land and vesting the title thereto in the defendants in error McKnight and Haskett, as grantees of the said Albert Lamar.

It is earnestly insisted that said court did not have jurisdiction to enter said decree. It will be borne in mind that the allotment of John Nestell was, during his lifetime, inalienable, and, although a trust patent had been issued to him, the legal title to the land was in the United States during the trust period, and the allottee had only the right of occupancy. At the end of the trust period, under the Allotment Act, it was to be conveyed to him, or in case of his death to his heirs, by the ultimate or final patent from the United States. McKay v. Kalyton, 204 U. S. 458, 27 Sup. Ct. 346, 51 L. Ed. 566; Hallowell v. United States, 221 U. S. 317, 31 Sup. Ct. 587, 55 L. Ed. 750; Heckman v. United tates, 224 U. S. 413, 32 Sup. Ct. 424, 56 L. Ed. 820; Monson v. Simonson, 231 U. S. 341, 34 Sup. Ct. 71, 58 L. Ed. 260; Cæsar v. Krow, 71 Oklahoma, 176 Pac. 927; United States Fidelity & Guar. Co. v. Hansen, 36 Okla. 459, 129 Pac. 60, Ann. Cas. 1915A, 402. State courts did not have jurisdiction to determine the heirship of the said John Nestell after his death and during the trust period. Caesar v. Krow, supra, and cases therein cited.

Many cases are cited by counsel for plaintiffs in error in support of their view that the title never vested in John Nestell, and that the heirs took by direct grant from the United States as objects of its bounty. Among these authorities are Hall v. Russell, 101 U. S. 503, 25 L. Ed. 829; McCune v. Essig (C. C.) 118 Fed. 273; Id., 122 Fed. 588, 59 C. C. A. 429; Id., 199 U. S. 382, 26 Sup. Ct. 78, 50 L. Ed. 237; Hershberger v. Blewett (C. C.) 55 Fed. 170; Rogers v. Clemmans, 26 Kan. 523; Coulson v. Wing, 42 Kan. 507, 22 Pac. 570, 16 Am. St. Rep. 503; Cooper v. Wilder, 111 Cal. 195, 43 Pac. 591, 52 Am. St. Rep. 163; Lamb v. Starr, Fed. Cas. No. 8,022, Deady, 447; Wittenbroock v. Wheadon, 128 Cal. 150, 60 Pac. 664, 79 Am. St. Rep. 32; Gjerstadengen v. Van Duzen, 7 N. D. 612, 76 N. W. 233, 66 Am. St. Rep. 679; Martyn v. Olson, 28 N. D. 317, 148 N. W. 834, L. R. A. 1915B, 681; Criner v. Farve, 44 Okla. 618, 146 Pac. 10. These cases are materially different from the instant case in one important respect, since all are based upon the vital proposition that the original claimant was entitled to the allotment only on condition that he fulfilled certain requirements provided by the act under which he claimed the land. In Hall v. Russell, supra, a case arising in the state of Oregon under the act of Congress commonly called the "Donation Act," which provided that where a settler died prior to the expiration of the four years' residence all of the rights of the deceased should

descend to his heirs at law, including the widow, it was held that the heirs became qualified grantees upon his death and took title to the land direct from the United States. The reason upon which this decision was based was that the act required full four years' residence by the person claiming the grant, and that except for the above provision of the act all the rights of the settler would have been lost by his death, and he would have had nothing in the land to descend to his heirs. The case of McCune v. Essig, supra, arose under the Homestead Law, and the claimant died before he had performed all the conditions precedent entitling him to a patent, and it was held that by the provision permitting his widow to complete what was necessary to be done in order to acquire the patent, and for the conveyance of the title to her in her own right, she took title, not by inheritance from the deceased, but by grant directly from the United States. The case of Criner v. Farve, supra, involved the allotment of one Joseph Baptiste, a Mississippi Choctaw Indian, under an act of Congress (Act July 1, 1902, c. 1362, 32 Stat. 651) which granted him the land on the condition that he reside in the Indian Territory for a number of years after making selection of the allotment. Section 5 of the act of April 26, 1906 (34 Stat. 138, c. 1876), conferred upon the decedent's heirs the right to make the necessary proof where the claimant died after selection and before performing the conditions, and it was held that the said Joseph Baptiste, at the time of his death, did not have any devisable interest in the land, and that, upon the making of the necessary proof by the heirs and the issuance of the patent, the title inured to and vested in his heirs.

It is unnecessary to specifically mention the other cases, as they all involved the same principle. But a very different situation is here presented. By the provisions of the act under which John Nestell took the allotment there was nothing further for him to do; his right to the allotment had become absolute, and the preliminary patent had issued, and at the expiration of the trust period he was entitled to a patent in fee therefor, provided he lived, and, in the contingency of his death during the trust period, the same title that he had vested in his heirs, and they likewise became entitled to the patent in fee at the expiration of the trust period. The act specified that the patent should be issued to John Nestell, but in fact it was issued to his heirs after his death. This, however, is immaterial, for it

had the same legal effect as if issued to him during his lifetime under section 5098, U. S. Comp. Stat. 1918 (section 2448, U. S. Rev. Stat.), which reads as follows:

"Where patents for public lands have been or may be issued, in pursuance of any law of the United States, to a person who had died, or who hereafter dies, before the date of such patent, the title to the land designated therein shall inure to and become vested in the heirs, devisees, or assignees of such deceased patentee as if the patent had issued to the deceased person during life."

The intent of Congress that the estate was a descendible one is evident from the above provision. A similar question was decided by the Circuit Court of Appeals in Shulthis v. McDougal et al., 170 Fed. 529, 95 C. C. A. 615. The allotment in controversy in that case was that of one Andrew J. Berryhill, a member of the Creek Nation of Indians, who died before allotment, and who took by virtue of the following provision of Act June 30, 1902, c. 1323, 32 Stat. 501:

"And if any such child has died since May 25, 1901, or may hereafter die before receiving his allotment of lands and distributive share of the funds of the tribe, the lands and moneys to which he would be entitled if living shall descend to his heirs as herein provided and be allotted and distributed to them."

In holding that said allottee took said lands by descent, and not by purchase, the court called attention to section 5 of the Act of April 26, 1906, c. 1876, 34 Stat. 138, which reads as follows:

"That all patents or deeds to allottees in any of the Five Civilized Tribes to be hereafter issued shall issue in the name of the allottee, and if any such allottee shall die before such patent or deed becomes effective, the title to the lands described therein shall inure to and vest in his heirs; and in case any allottee shall die after restrictions have been removed, his property shall descend to his heirs or his lawful assigns, as if the patent or deed had issued to the allottee during his life, and all patents heretofore issued, where the allottee died before the same became effective, shall be given like effect."

It will be seen that the language just quoted bears a similar relation to the allotment of Andrew J. Berryhill as the language of section 2448 bears to that of John Nestell. Speaking to the question then under consideration, the Circuit Court of Appeals said:

"It was never the intent, however, either of the tribe or of the federal government to grant to parties having a kinsman who had died before the actual making of the allotment additional lands as a bounty. These

kinsmen got all their right to additional lands under and through the enrolled member who had died. Whether the ancestor was actually seised of the property or not in his lifetime was immaterial. It was the intent of the statute that the property should pass by the same right and in the same manner that it would have passed if the person enrolled had survived to receive his allotment. The tribe was not bestowing such land as a bounty, but was simply providing for the right of inheritance.".

And with direct reference to section 5 of the act of April 26, 1906, the court said:

"Here is an express declaration by Congress that the land shall descend to heirs the same as it would have descended if the patent or deed had issued to the allottee during his life, and it is declared that allotments for allottees who have died shall also thus descend. This interpretation by Congress of its own act leaves no room for doubt as to its intent."

A very similar question was before this court in Moffett v. Conley, 63 Oklahoma, 163 Pac. 118. In that case subsequent to the death of one Moses Coney, a Creek Indian, an allotment was made in his name, and thereafter a patent was issued to his heirs. In deciding that the estate was one of inheritance, and went by operation of law, and not by purchase, to the heirs, this court, in an opinion by Mr. Justice Sharp, said:

"The allotment selected and made subsequent to his death was made in satisfaction of the right which he, as one of the enrolled citizens and allotable units of the tribe, had in his lifetime. The heirs took their title, therefore, not because of their enrollment as tribal citizens alone, but because they were his heirs—because they were related to him by consanguinity and succeeded to his rights at his death. That the children of Moses Coney did not take their title by purchase is, we think, settled by both the decisions of this court and the federal courts in cases arising in this state. * * * That the lands were not allotted in the lifetime of Moses Coney, but in his place and stead, and on account of his right, does not serve to change the character of the estate. The lands allotted on his account were not intended as a bounty or gratuity to the heirs by the tribe; they neither gave nor did anything in bringing about the title. The rights of Jennie Hickory's father attached during his lifetime, and it was in that right that the lands were consequently set apart as an allotment. Jennie and her brother, standing in the ancestor's place and representing him under the statute, succeeded to the same rights that Moses had at the time of his death. This right constituted an estate of inheritance and went by operation of law to his heirs."

See, also, United States v. Bessie Wildcat et al., 244 U. S. 111, 37 Sup. Ct. 561, 61 L. Ed. 1024; Jesse et al. v. Chapman, 68 Oklahoma, 173 Pac. 1044, and cases therein cited.

Although the facts in none of the cases alluded to are identical in all respects, they are controlled by the same principle. Whatever the character of the title John Nestell had during his lifetime and prior to the issuance of patent, it was at least as great, if not greater, than that possessed by Moses Coney to the allotment involved in the last-mentioned case. From a careful consideration of the above and many other authorities, we are of the opinion that the allotment of John Nestell vested in his heirs as an estate of inheritance by operation of law, and that they did not take their title as a direct grant from the United States.

As we have already seen, although the decedent's allotment descended to his heirs according to the Oklahoma laws of descent, during the trust period the state courts were without jurisdiction to determine who, in fact, were his heirs, and this condition existed at the time of the appointment of the executor for his estate. However, the probate court of Caddo county lacked jurisdiction to determine who in fact were his heirs only because the plenary authority to legislate for the Indians relative to their allotted lands rested solely with Congress, and not because the Oklahoma law did not make provisions therefor. The county courts of this state, in the exercise of their probate jurisdiction, have jurisdiction to determine heirship in the distribution of the estate of a deceased person. It follows that when the Secretary of the Interior, pursuant to the aforementioned act of Congress, issued a patent to the heirs of John Nestell, which operated to remove all restrictions as to the sale, incumbrance, or taxation of the land therein conveyed, without having determined subsequent to his death who were in fact his heirs, all federal supervision over the allotment ceased, and the same became a part of the estate of the said decedent, and came within the jurisdiction of the probate court of Caddo county, and was subject to be distributed to his heirs the same as any other property of which he died seised, although it was not subject to the payment of his debts, or to be taken pursuant to any contract made prior to the removal of restrictions on the land. The probate court of Caddo county was, therefore, acting within its jurisdiction in determining who, in fact, were heirs of the decedent, and in ordering the estate distributed according to such findings.

The judgment of the probate court is attacked on several other grounds, all of which are collateral, and so long as the decree of distribution remains unreversed, unmodified, and unappealed from it must be given full force and effect, and therefore the contention that the court was without jurisdiction to render the decree on account of irregularity in the proceedings is not tenable. One of the alleged defects in the proceedings is that prior to the rendition of the decree the court had already rendered a final judgment in the cause, and that it was without jurisdiction to render another. The judgment previously rendered by the court only went to the extent of approving the account of the executor and ordering his discharge upon his compliance with the order, and it did not attempt to determine the heirship of the decedent or to distribute his real property. At the time of the entering of the decree of distribution the executor had not been discharged, since an appeal had been taken from the order settling his final account and ordering his discharge upon compliance with the order of the court, and, although the appeal had been dismissed, nothing further had been done. There is not any merit in the contention that the court could not enter a decree of distribution, except upon a final settlement, for authority is conferred upon the court to distribute the estate after settlement of the final account under section 5413, Comp. Laws 1909 (section 6463, Rev. Laws 1910), which reads, in part, as follows:

"Upon the final settlement of the accounts of the executor or administrator, or at any subsequent time, upon the application of the executor or administrator, or of any heir, legatee or devisee, the court must proceed to distribute the residue of the estate. * * * "

A judgment may be assailed for fraud extraneous to the issues practiced on the court, or on the party against whom the judgment was rendered, which prevented him from having a fair opportunity to present his case, and it is immaterial, when a judgment is attacked on the ground, whether it is denominated direct or collateral. Griffin v. Culp, 68 Oklahoma, 174 Pac. 495. But the alleged fraud relied on to set aside the judgment of the county court is that the testimony upon which the decree of distribution was based was false, and such a claim cannot prevail in this action, for it is well settled that a judgment cannot be set aside in an independent proceeding, where the fraud alleged inheres in the verdict. Brown et al. v. Trent et al., 36 Okla. 239, 128 Pac. 895; Driskill v. Quinn et al., 69 Oklahoma, 170 Pac. 495; Thigpen v. Deutsch,

et al., 69 Oklahoma, 166 Pac. 901. In Brown v. Trent, supra, this court said:

"Not every kind of fraud will vitiate a judgment. There are authorities holding that a judgment or verdict obtained on perjured testimony can be set aside in equity; but this is not believed to be the law. To investigate the character of testimony upon which a judgment was obtained would be to retry the issues submitted in the trial at which the judgment was obtained, and the result would be that there would be no end to the litigation. The fraud which will vitiate a judgment must be extraneous to the issues, and such as deprived the party of a fair opportunity to present his case."

The court found for the defendants, which includes a finding that there was no fraud extraneous to the issues in procuring the decree of distribution in the county court, and in an action for the recovery of real estate, tried to the court without a jury, under the well-settled decisions of this court, the finding of the court upon disputed questions of fact will be given the same weight and effect as the verdict of the jury, and, where reasonably supported by the evidence, will not be disturbed on appeal.

Finding no reversible error in the record, the judgment is affirmed.

OWEN, C. J., and KANE, HARRISON, and JOHNSON, JJ., concur.