**CHISHOLM et al. v. HOUSE et al.**

**UNITED STATES v. SAME.**

Nos. 3220, 3249.

Circuit Court of Appeals, Tenth Circuit.

Feb. 10, 1947.

Rehearing Denied April 14, 1947.

Creekmore Wallace and Don Anderson, both of Oklahoma City, Okl. (B. E. Harkey, of Oklahoma City, Okl., and Roy White, of Eufaula, Okl., on the brief), for George Chisholm et al., appellants.

Charles O. Butler, Sp. Asst. to Atty. Gen. (David L. Bazelon, Asst. Atty. Gen., and Roger P. Marquis, Atty., Dept. of Justice, of Washington, D. C., on the brief), for the United States.

Alfred Stevenson, of Holdenville, Okl. (W. T. Anglin and O. S. Huser, both of Holdenville, Okl., on the brief), for D. W. Johnston and Washington Grayson.

Paxton Howard, of Tulsa, Okl. (Geo. W. Cunningham, of Tulsa, Okl., and Jesse M. Davis, of Houston, Tex., on the brief), for Shell Oil Co.

Thomas M. Finney, of Tulsa, Okl. (Villard Martin, Garrett Logan, and R. J. Stanton, all of Tulsa, Okl., on the brief), for Martin, Randles, Chowning and Okemah Nat. Bank.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

Cussehta Yarhola,[1] Linda Yarhola,[2] Maley Fiers,[3] and Lessey Yarhola[4] were enrolled, full-blood Creek Indians. Linda and Maley were each allotted tracts of land, situated in Creek County, Oklahoma. Nancy Yarhola,[5] now Bradburn, is an enrolled, full-blood Creek Indian. Cussehta was the husband of Linda and the father of Maley, Nancy, and Lessey.

Maley and Linda executed oil and gas leases covering their respective allotments. Both leases were duly approved by the Superintendent of the Five Civilized Tribes and by the Secretary of the Interior. Each lease reserved a royalty of one-eighth of the proceeds derived from the sale of oil and gas produced, and provided that such royalty should be paid to the lessor and her successors in interest.

House was employed as a field clerk in the Union Agency at Muskogee, Oklahoma, from 1910 to 1913. He became acquainted with the Yarhola family in 1915. Cussehta, Linda, and Maley reposed trust and confidence in House. Linda sought House's advice and counsel in the preparation of her will. The will named House as executor thereunder and provided he should receive for his services, 10 per cent of all property coming into his hands as such executor. Linda died October 11, 1916. By her will, she provided that for the period of seven years next after her death, Nancy and Lessey should each be paid $2,000 per annum and Cussehta $1,000 per annum from her personal estate, and that at the end of such seven-year period, the remainder of her estate should be divided one-fifth to Cussehta, two-fifths to Lessey, and two-fifths to Nancy. Included in Linda's estate which passed under her will, was her allotment above referred to.

Maley died testate about May 3, 1917. By her will, she devised and bequeathed to Cussehta, the east one-half of her allotment and two-fifths of her personal property.

Linda's will was admitted to probate in the county court of Okmulgee County, Oklahoma. Maley's will was admitted to probate in the county court of Okfuskee County, Oklahoma. House and H. E. Kennedy were appointed executors under the will of Linda. House was appointed administrator with the will annexed of Maley's estate.

On May 16, 1921, there had accumulated in the custody of the Secretary of the Interior, $242,500 belonging to the estate of Linda, which had been invested in United States bonds and was held in trust by the Secretary of the Interior. On the last-

---

[1] Hereinafter referred to as Cussehta.
[2] Hereinafter referred to as Linda.
[3] Hereinafter referred to as Maley.

[4] Hereinafter referred to as Lessey.
[5] Hereinafter referred to as Nancy.

mentioned date, the Secretary of the Interior delivered these bonds to House and Kennedy.

On February 16, 1917, an order was entered in the county court of Okfuskee County, Oklahoma, adjudging Cussehta incompetent and appointing W. H. Barber as guardian of his person and estate. The evidence introduced at the hearing on the petition for the appointment of a guardian for Cussehta fully sustained the finding of incompetency. On February 28, 1921, Barber filed a petition in the county court of Okfuskee County, requesting that House be appointed co-guardian of Cussehta. On February 28, 1921, an order was entered appointing House as co-guardian of Cussehta.

There had accumulated in the hands of the Secretary of the Interior, $160,500 belonging to the estate of Maley. The Secretary of the Interior had invested such funds in United States bonds and held such bonds in trust. The Secretary of the Interior delivered to House and Barber, as guardians of Cussehta, such bonds and $35,612.09 in cash. Such invested funds and cash were income derived from Maley's allotment and had passed to Cussehta under Maley's will.

Barber resigned as co-guardian of Cussehta in July, 1921. House resigned as co-guardian of Cussehta in March, 1923. From March, 1923, to April, 1924, H. A. Dolen and Hill Moore were guardians of Cussehta.

On September 25, 1923, Cussehta filed a petition in the county court of Okfuskee County seeking his restoration to capacity. Thereafter, he filed a motion to dismiss such petition. The motion to dismiss came on for hearing on October 1, 1923. At that hearing, Cussehta appeared in person; Dolen and Hill Moore appeared in person and by Crump, White and Seawell, their attorneys. At the hearing, Cussehta testified that Barney Beaver and one Cunningham induced him to sign the petition; that they represented to him that his guardians were wasting his estate, that Lake Moore and Joe Stone had got a lot of money out of his estate, and that if he would sign the paper, they would get the money all back within a week; that he had learned they had lied to him; and that he desired to dismiss the petition. For their services rendered to the guardians, Crump, White and Seawell were allowed a fee of $10,000 by the county judge.

On April 21, 1924, L. H. McDermott filed a petition in the county court of Okfuskee County in which he alleged that he was a friend of Cussehta and prayed that Cussehta be restored to capacity and that his guardianship be terminated. House employed Crump, White and Seawell to represent Cussehta and McDermott in the proceeding to have Cussehta restored to competency commenced on April 21, 1924. The petition purported to be signed by Cussehta by his thumbmark and to be verified by McDermott and Cussehta. Attached to the petition are certificates of Washington Grayson certifying that he signed Cussehta's name to the petition and to the verification in Cussehta's presence and at his request. On April 24, 1924, Seawell, the County Judge of Okfuskee County, filed a certificate in the matter in which he certified that he was disqualified to hear and determine the petition to restore Cussehta to capacity on account of relationship to the parties and bias and prejudice. On April 28, 1924, an agreement, selecting Guy L. Trimble, a duly licensed and practicing attorney and a member of the bar of Okfuskee County, as special judge to hear and determine the matter, executed by McDermott as next friend of Cussehta, by Crump and Carver, attorneys for Cussehta, by Hill Moore, guardian of Cussehta, and by White and Nichols, attorneys for such guardian, was filed in the county court of Okfuskee County. On April 21, 1924, Seawell entered an order setting the petition for hearing on April 25, 1924. On April 24, 1924, Dolen, the guardian, filed a motion for continuance. On April 28, 1924, the cause came on for hearing before Trimble, the special judge. Crump and Seawell appeared as counsel for petitioner and Cussehta. White and Nichols appeared as counsel for Moore and Dolen, guardians. Dolen tendered his resignation in open court. The court accepted such resignation and his name was stricken as a party to the proceeding. Cussehta appeared as a witness and testified in his own behalf.

McDermott, D. W. Johnston, and four other witnesses appeared and gave testimony tending to establish Cussehta's competency. Two witnesses were called by the guardian and also gave testimony tending to establish Cussehta's competency. On April 28, 1924, Trimble, the special judge, entered an order in which he recited that McDermott and Cussehta appeared in person; that Selie Yarhola, wife of Cussehta, Lessey, his daughter, and Corner Hawkins, her husband, appeared in person and by their attorneys, Crump and Seawell; that Moore appeared in person and by his attorneys, White and Nichols; that Dolen tendered his resignation as guardian in open court and that the resignation was accepted and his name was stricken as a party; that the parties announced they were ready for trial; and that the testimony of witnesses was introduced; and in which he found that Cussehta was a person of sound mind and fully competent to manage his own estate; and in which he adjudged that Cussehta be restored to competency, and that his guardians be discharged, and that such guardians account to him for his estate in their hands. The testimony introduced at the hearing was sufficient to support the findings of the special judge.

Prior to the filing of the second petition to restore Cussehta to capacity, he entered into an agreement with House by which he agreed to pay House 10 per cent of the value of his estate in consideration of House's bringing about his restoration to capacity. On April 29, 1924, Cussehta and his wife, Selie, went to Muskogee, where they met House and R. S. Cate, a lawyer and an associate of House. At Muskogee, Cussehta and Selie executed a trust instrument which had therefore been prepared by Cate at House's request and under his direction. However, the trust instrument purports to have been executed and acknowledged before a notary public on April 28, 1924. At the same time, House selected notes and mortgages belonging to Cussehta of the face value of $30,600, and Cussehta endorsed such notes and assigned such mortgages to House as compensation for his services in bringing about Cussehta's restoration to capacity.

The trust instrument designated Grayson and Hill Moore as trustees. It provided that they should execute and deliver to Cussehta a bond in the sum of $200,000, conditioned for the faithful performance of their duties as trustees; that they should pay Cussehta a monthly allowance of $500; that the term of the trust should be seven years; and that the trustees should hold, manage, control, and operate the trust estate and invest and reinvest the principal and income thereof. It empowered the trustees to sell or dispose of all or any portion of the estate, and to make, execute, and deliver written instruments necessary to effectuate sales or dispositions made by them. It provided that they should receive for their services 10 per cent of all income received and accounted for by them, and actual and necessary expenses, including attorneys' fees.

Thereafter, Cussehta and his wife, Selie, executed supplements to the original trust instrument, one dated September 9, 1924, modifying the original trust instrument and reducing the bond to $50,000; one dated April 13, 1925, modifying the original trust instrument by providing for a personal bond to be signed by Lake Moore, W. E. McKinney, and A. J. Martin, as sureties, and for joint control by the trustees and one of the sureties; one dated September 24, 1925, modifying the original trust instrument by extending the term of the trust to 21 years from April 28, 1924, fixing the trustees' compensation at $5,000 per year, and limiting their attorneys' compensation to $3,000 per year; and one dated July 13, 1927, modifying the original trust instrument by providing for the payment of $1,000 per month to Cussehta during his lifetime, and $1,000 per month thereafter to his surviving heirs, and for the distribution, at the termination of the trust, of the trust estate to the heirs of Cussehta.

The original trust instrument purported to convey to the trustees the interests acquired by Cussehta in the two allotments through devises from Linda and Maley, and to transfer to the trustees $820.94 in cash, and notes of the face value of $275,800, secured by real estate mortgages. The cash, the notes transferred to House, and the

638

notes transferred to the trustees were the proceeds of cash royalties received by Cussehta under such oil and gas leases.

Cussehta died November 13, 1936, leaving Nancy and Lessey as his only heirs-at-law. On April 29, 1924, he had executed a last will and testament, to which McDermott and House were witnesses. On December 31, 1936, the will was admitted to probate in the county court of Okfuskee County. On December 28, 1937, the county court of Okfuskee County entered an order in which it adjudged that Nancy and Lessey were the sole heirs-at-law of Cussehta. In the order admitting the will to probate, the county court of Okfuskee County adjudged that the trust estate did not pass under the will.

On January 12, 1915, the county court of Okfuskee County, Oklahoma, adjudged Nancy, then Nancy Severs, an incompetent, and entered an order appointing Fred L. Strough as guardian of her person and estate. On January 29, 1923, the county court of Okfuskee County appointed H. C. Skinner co-guardian of the person and estate of Nancy.

On June 14, 1924, Nancy and her husband, William Severs, filed a petition in the county court of Okfuskee County seeking Nancy's restoration to capacity. On the same day, Nancy and Severs filed an application to disqualify the county judge, in which they alleged that they did not believe the county judge could fairly and impartially try the issues on her petition for restoration to capacity. On the same day, the county judge certified his disqualification. Thereafter, on the same day, counsel for Nancy and Severs, and counsel for Skinner, Nancy's guardian, entered into and filed, in the county court, a written stipulation agreeing that E. Huser, a member of the bar of Okfuskee County, should act as special county judge and hear and determine the issues presented by such petition. On the same day, Huser took and filed a written oath as special county judge and proceeded to hear the petition. At the hearing, Nancy and Severs appeared in person and by counsel. Skinner, Nancy's guardian, appeared in person and by counsel. Strough had theretofore resigned as guardian. Cussehta appeared in person.

All parties announced that they were ready for trial. Evidence was adduced and thereupon the special county judge found that Cussehta was the father of Nancy; that the mother of Nancy had been dead for many years; that William Severs was the husband of Nancy; that Nancy and William Severs were residents of Okfuskee County; that Nancy had theretofore been adjudged incompetent by the county court of Okfuskee County; that Nancy was entirely sane, and in all respects competent to manage and control her estate. It entered an order adjudging that Nancy be restored to capacity and that her guardian deliver to her all of her property in his hands.

On September 23, 1915, Lessey was adjudged an incompetent by the county court of Okfuskee County and Strough was appointed guardian of her estate.

Thereafter, Corner Hawkins, husband of Lessey, filed a petition seeking Lessey's restoration to capacity. The petition came on for hearing on December 29, 1922. Evidence was adduced tending to establish Lessey's competency. On December 30, 1922, the county court entered an order adjudging that Lessey be restored to capacity and directing her guardian to deliver to her all of her property in his hands.

Prior to their restorations to capacity, Nancy and Lessey had entered into agreements with House to pay to him 10 per cent of the value of their respective estates in consideration of his bringing about their restorations to capacity. Immediately after Nancy's restoration to capacity, she transferred to House a note and mortgage of the face value of $15,000. Immediately after Lessey's restoration to capacity, she paid House an amount equal to 10 per cent of the value of her estate.

From the inception of Cussehta's trust until shortly before April 13, 1925, House was the agent for the corporate surety on the bond of Hill Moore and Grayson, as trustees, and exercised joint control over the trust assets and received the agent's commission on the premium paid for the bond. Hill Moore had a desk in House's office and solicited insurance for House.

On April 15, 1925, Lake Moore, McKinney, and Martin executed, as sureties for

the trustees, a bond for $50,000. Pursuant to the terms of the supplemental trust instrument of April 13, 1925, a joint control agreement was executed on April 15, 1925, giving Martin joint control with the trustees over the trust assets. Martin exercised such joint control until December 19, 1929, through possession of the trust assets, the countersigning of checks signed by the trustees, and a veto power with respect to loans made by the trustees. For this service, Martin received $700 per year. He divided the amount so received with Chowning and Randles who were officers of the Okemah National Bank of which Martin was president. On December 23, 1929, Cussehta signed an instrument purporting to release Lake Moore, McKinney, and Martin as sureties on the trustees' bond.

On December 19, 1929, Hill Moore resigned as trustee and the supplemental trust instrument of that date, naming D. W. Johnston as successor trustee, was executed by Cussehta. On December 19, 1929, D. W. Johnston was indebted to the trustees on two notes, one for the principal sum of $2,000, and one for the principal sum of $15,000. At the time D. W. Johnston became trustee, his father, William Johnston, was indebted to the trust on three loans, the principal of which aggregated $12,000. After D. W. Johnston became trustee, no effort was made to collect either the principal of, or interest on, the loans made to him and to his father.

No trustees' reports could be produced for the period from April 28, 1924, to September 25, 1925. The trustees, Moore and Grayson, furnished Cussehta with reports for the following periods:

"(a) From September 25, 1925, to March 31, 1926;

"(b) From April 1, 1926, to October 27, 1926;

"(c) From October 28, 1926, to April 15, 1927;

"(d) From April 15, 1927, to October 3, 1927;

"(e) From October 6, 1927, to April 10, 1928;

"(f) From April 10, 1928, to January 10, 1929;

"(g) From January 10, 1929, to July 2, 1929;

"(h) From July 3, 1929, to December 18, 1929."

As each report was made, the trustees induced Cussehta to execute, by his thumbmark, a certificate attached to each report reciting that the report had been read, interpreted, and translated to him; that after examination, he found the same to be true and correct, and that he acknowledged full accord and satisfaction, and released and discharged the trustees and the sureties on their bond of and from all further liability to him under or by reason of the trust instruments and the acts of the trustees thereunder. Grayson and D. W. Johnston furnished Cussehta an annual report for the period from December 24, 1929, to December 20, 1930. The trustees induced Cussehta to sign a certificate attached to that report to the same effect as those attached to the earlier reports.

On November 29, 1937, Grayson and D. W. Johnston, as trustees, made a final report to Nancy and Lessey which showed cash on hand, $383.97, notes secured by mortgages, $32,948.87, and property owned by the trustees, $50,000. The trust estate had shrunk from $307,220 in 1924 to $83,332 in 1937.

The annual report and the final report made by D. W. Johnston and Grayson did not reflect the D. W. Johnston loans which had not been repaid to the trust. The final report did not reflect the Lake Moore loans which had not been repaid to the trust.

After D. W. Johnston became trustee of Cussehta's trust, the trustees carried the trust funds on deposit in the National Bank of Weleetka. The final report above referred to showed items of disbursement by the trustees between January 3, 1931, and November 1, 1937, aggregating $40,728.09, which do not appear on the ledger sheets of the trustees' account in such bank, and the ledger sheets of the trustees' account in such bank show disbursements by the trustees between March 25, 1931, and December 23, 1937, aggregating $39,768.19, not reflected in the final report of the trustees.

In February and March, 1925, the funds of the trust were on deposit in the First National Bank of Muskogee. The ledger sheets of that bank show two disbursements of trust funds by the trustees, one of $40,-000 on February 28, 1925, and another of $10,295 on March 26, 1925, which are not reflected in the reports of the trustees, or otherwise accounted for. The ledger sheets of that bank also show that on February 25, 1925, there was deposited in that bank in the trust account, $42,217.76, which is not reflected in the reports of the trustees and is not otherwise accounted for.

For a short period after the execution of the original trust, Hill Moore and Grayson received 10 per cent of the income of the trust estate as their compensation. Thereafter, they each received a fee of $5,000 per year for their services and their attorneys received a fee of $3,000 per year.

D. W. Johnston and Grayson brought an action against Nancy and Lessey in the district court of Okfuskee County, numbered 9424 on the docket of such court. On December 1, 1937, a judgment was entered in such cause which recited that the cause came on regularly for hearing by agreement of the parties on November 29, 1937; that D. W. Johnston and Grayson appeared by their attorneys, Phillips and Long, and that Nancy and Lessey appeared by their attorneys, William L. Seawell and R. S. Cate; that each of the parties introduced evidence; that thereupon, by stipulation of the parties, the cause was continued to December 1, 1937; that the cause came on for further hearing on December 1, 1937; that each of the parties introduced additional evidence and rested. It set forth findings to the effect that on November 29, 1937, D. W. Johnston and Grayson, by an instrument in writing, resigned as trustees of the Cussehta trust; that at that time, they stated an account and presented a full and final report of the administration of such trust by them; that such statement and report was presented to, and carefully examined by, Nancy and Lessey and accepted by them as a true, correct, full, and final statement; that Nancy and Lessey had executed a final satisfaction and acquittance to the trustees; that such

final settlement was fairly entered into and was free from fraud, misrepresentation, or undue influence; that the trustees had executed and delivered to Nancy and Lessey proper assignments and conveyances of all of the trust property and had delivered to them all notes and securities held in the trust estate, and had paid over to them all moneys in the hands of the trustees, and that Nancy and Lessey had accepted them in open court.

It adjudged that the resignation of the trustees be accepted, approved, and confirmed; that the trust agreements be fully dissolved, canceled, and terminated; and that the trustees and their bondsmen be released and discharged.

Nancy and Lessey and their attorneys accepted the final report made by D. W. Johnston and Grayson, as trustees, as true and correct. Bank records of the trustees' accounts were not exhibited to Nancy and Lessey or their attorneys and no independent investigation or audit was made of the trustees' accounts. The judgment entered by the state district court in No. 9424 was a consent judgment.

The Shell Oil Company, [6] a corporation, produced oil from the allotments from April 28, 1924, to November 29, 1937, under the oil and gas leases referred to above and paid royalties under such leases to Cussehta's trustees in the aggregate sum of $72,403.57.

Lessey died intestate February 7, 1940. She left surviving as her only heirs-at-law her husband, George Chisholm, and three sons, Ben Hawkins, Bill Hawkins, and Sam Buck.

Chisholm, as administrator of the estate of Lessey, Ben Hawkins, Buck, and K. C. Burnham, as guardian of Bill Hawkins, a minor, brought this action on November 23, 1940, against House, D. W. Johnston, Grayson, Martin, McKinney, Lake Moore, Randles, Chowning, and the Okemah National Bank in the district court of Muskogee County, Oklahoma. Notice of the pendency of the action was served upon the Superintendent of the Five Civilized Tribes as provided by the Act of April 12, 1926. [7] The United States duly removed

---

[6] Hereinafter called Shell.

[7] 44 Stat. 239, 240.

the action to the United States District Court for the Eastern District of Oklahoma.

Thereafter, the trial court entered an order making Shell a party defendant.

Thereafter, the United States filed an amended petition in intervention in its own behalf and in behalf of Nancy, Chisholm, Bill Hawkins, Ben Hawkins, and Buck against the defendants to the original complaint, and Shell.

By its amended complaint, the United States sought a decree canceling the trust instrument of April 28, 1924, and the supplemental trust instruments and the releases and acquittals of the trustees, adjudging that the defendants below, other than Shell, account for all of the funds, property, and assets received, supervised, and administered by them, belonging to Cussehta, between April 28, 1924, and November 13, 1936, and thereafter belonging to Nancy, Lessey, and the heirs-at-law of Lessey, and awarding judgment against the defendants, other than Shell, for the amounts found to be due, with interest, and awarding judgment against Shell for $72,403.57 on account of the royalties paid to the trustees of Cussehta under such oil and gas leases.

The grounds upon which relief was sought are that the order restoring Cussehta to capacity was void on the face of the proceeding in which it was entered; that the United States is entitled to equitable relief as to such order on the ground of extrinsic fraud; that the defendants below, other than Shell, entered into a conspiracy to dominate, control, supervise, and direct the administration of Cussehta's property with the object of cheating and defrauding Cussehta and improperly appropriating the funds, property, and securities of Cussehta to their own use and benefit; that for the purpose of accomplishing such objects, the defendants, other than Shell, induced Cussehta to file and prosecute a petition for restoration to capacity and to execute the trust instruments, the supplements thereto and the releases executed to the trustees; that the trustees violated their fiduciary obligations to Cussehta; and that Shell had knowledge of the invalidity of the trust instruments and the instruments supplemental thereto, executed by Cussehta, and of the fraudulent conspiracy.

Issues were joined and the cause came on for hearing.

Evidence with respect to which there was no substantial dispute established the facts hereinbefore stated.

At the close of the evidence introduced in behalf of the plaintiffs and the intervenors, the defendants interposed motions to dismiss. The trial court sustained the motions and entered a judgment in favor of the defendants below. From that judgment, Chisholm, Nancy, Bill Hawkins, Buck, and Leta Hawkins, Patricia Ann Hawkins, Ben Francis Hawkins, and Sam Hawkins, minors and the heirs-at-law of Ben Hawkins, by their guardian, Leta Hawkins, and Roy D. Taylor, administrator of the estate of Cussehta, have prosecuted an appeal, numbered 3220 in this court, and the United States has prosecuted a separate appeal, numbered 3249 in this court.

The question is whether, under the facts established by the evidence, plaintiffs were entitled to relief.

## I.

█ The facts with respect to the order restoring Cussehta to capacity and the proceeding in which such order was entered, and the order restoring Lessey to capacity and the proceeding in which such order was entered, do not differ susbtantially from the facts with respect to the order restoring Nancy to capacity and the proceeding in which that order was entered. In Bradburn v. McIntosh, 10 Cir., 159 F.2d 925, we held that the order restoring Nancy to capacity was not void on the face of the proceeding. For the reasons stated in the opinion in that case, we hold that each of such orders was not void on the face of the proceeding in which it was entered.

## II.

The evidence wholly failed to establish that Shell either participated in, or had any knowledge of, the fraudulent scheme and plan, or the fraud practiced on Cussehta.

█ By virtue of the provisions of § 9 of the Act of May 27, 1908, 35 Stat. 312, on the death of Linda and Maley, the interests in their allotments which passed by their re-

spective wills to Cussehta were freed of restrictions.

The Act of April 12, 1926, 44 Stat. 239, amended § 9 of the Act of May 27, 1908, to read in part as follows:

"The death of any allottee of the Five Civilized Tribes shall operate to remove all restrictions upon the alienation of said allottee's land: *Provided,* That hereafter no conveyance by any full-blood Indian of the Five Civilized Tribes of any interest in lands restricted by section 1 of this Act acquired by inheritance or devise from an allottee of such lands shall·be valid unless approved by the county court having jurisdiction of the settlement of the estate of the deceased allottee or testator: * * *"

Since the interest which Cussehta acquired in such allotments came to him by devise from the allottees, any interest which Cussehta held in such allotments on April 12, 1926, became subject to qualified restrictions on that date.

Section 2 of the Act of May 27, 1908, in part provides:

"That leases of restricted lands for oil, gas or other mining purposes, * * * may be made, with the approval of the Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise."

■ Lands subject to the qualified restrictions imposed by § 9, supra, as amended, are restricted lands within the meaning of the above-quoted provision of § 2 of the Act of May 27, 1908.[8]

■ Pursuant to § 2, the Secretary of the Interior prescribed regulations governing the leasing of lands of members of the Five Civilized Tribes. Section 20 of such regulations provides that all royalties, rents, or payments due under leases which have been made or may be approved by the Secretary of the Interior shall be paid to the United States Indian Agency at Union Agency, Muskogee, Oklahoma, or to such other persons as may be designated by the Secretary of the Interior for the benefit of the various lessors. Section 25, as amended July 23, 1910, and November 29, 1912, of such regulations, authorizes the Superintendent of the Agency to withhold the disbursement of royalties derived from leases on restricted lands until such time or times as he considers the payment thereof to be for the benefit of the lessor, and impliedly authorizes the Superintendent to disburse the funds to the lessor when, in his opinion, so to do would be for the benefit of the lessor.[9]

■ Rents and royalties received from oil and gas leases on restricted lands of members of the Five Civilized Tribes were restricted solely by virtue of the rules and regulations promulgated by the Secretary of the Interior.[10]

■ Section 1 of the Act of May 27, 1908, and previous Acts of Congress authorized the Secretary of the Interior to remove restrictions from lands of allottees of the Five Civilized Tribes. Here, after the regulations above referred to had been promulgated, the Secretary of the Interior approved oil and gas leases covering Linda's and Maley's allotments, which expressly provided that the royalties under such leases should be paid to the allottees of the lands covered by the leases and their successors in interest. By that action, the Secretary of the Interior released the royalties under such leases from the restrictions imposed by the regulations. Whether the Secretary of the Interior, when the interest of Cussehta in the allotments became restricted on April 12, 1926, could have reimposed restrictions upon the rents and royalties under such leases we need not determine. Suffice it to say, he did not do so. It follows that the rents and royalties under such leases paid by Shell to the trustees were not restricted funds at the time they were so paid, and the United States, and the parties in whose behalf it sued, were not entitled to recover from Shell the amount of the rents and royalties which accrued under such leases.

8 Parker v. Richard, 250 U.S. 235, 238, 239, 39 S.Ct. 442, 63 L.Ed. 954.
9 Townsend v. First Nat. Bank & Trust Co., 10 Cir., 157 F.2d 852, 854.

10 Parker v. Richard, 250 U.S. 235, 237, 238, 39 S.Ct. 442, 63 L.Ed. 954.

## III.

■ A party to a judgment or those in privity with him may impeach such judgment in a collateral proceeding for inceptional or jurisdictional fraud, that is, fraud which goes to the very jurisdiction of the court and prevents it from obtaining the requisite power or jurisdiction to entertain or decide the issues in controversy.[11]

■■ Equitable relief from a judgment may be obtained on the ground of extrinsic or collateral fraud.[12] Fraud is regarded as extrinsic or collateral where it prevents a party from having a trial or from presenting his cause of action or his defense, or induces him to withdraw a defense, or operates upon matters pertaining not to the judgment itself, but to the manner in which it was procured.[13] Where, however, the judgment was founded on a fraudulent instrument or perjured evidence, or the fraudulent acts pertained to an issue involved in the original action and litigated therein, the fraud is regarded as intrinsic.[14]

■ The final report made by D. W. Johnston and Grayson to Nancy and Lessey and their attorneys omitted many disbursements reflected by the ledger sheets of the National Bank of Weleetka, and included many disbursements not reflected by the ledger sheets of such bank, during the time that D. W. Johnston and Grayson were trustees, and failed to disclose the D. W.

Johnston notes and mortgages which had not been paid. The trustees wholly failed to account for or explain the disbursement of $40,000 on February 28, 1925, the disbursement of $10,295 on March 26, 1925, and the deposit of $42,217.76 on February 25, 1925. The reports were, therefore, incomplete, false, and misleading.

Nancy and Lessey and their attorneys relied upon the final report and were thereby induced to consent to the judgment entered in cause No. 9424 by the state court.

We are of the opinion that D. W. Johnston and Grayson were guilty of extrinsic fraud which induced Nancy and Lessey and their attorneys to consent to the judgment in cause No. 9424, and that Nancy and Lessey's heirs are entitled to equitable relief enjoining D. W. Johnston and Grayson from setting up such judgment, as a defense, against Nancy and Lessey's heirs.

## IV.

The supplemental trust instrument of July 13, 1927, provided that in the event of the death of Cussehta prior to April 28, 1945, $1,000 per month should be paid by the trustees to the surviving heirs-at-law of Cussehta in accordance with the laws of descent and distribution of the State of Oklahoma and, upon the expiration of the term of the trust, the trustees should distribute the residue and remainder of the trust estate

---

[11] Lucy v. Deas, 59 Fla. 552, 52 So. 515, 516; Mahoney v. State Ins. Co., 133 Iowa 570, 110 N.W. 1041, 1042, 1043, 9 L.R.A.,N.S., 490; Bradburn v. McIntosh, 10 Cir., 159 F.2d 925; Freeman on Judgments, 5th Ed., Vol. 1, § 331.

See, also, Hill v. Cole, 192 Okl. 476, 137 P.2d 579, 581; Skipper v. Schumacher, 124 Fla. 384, 169 So. 58, 66; Bleakley v. Barclay, 75 Kan. 462, 89 P. 906, 909, 10 L.R.A.,N.S., 230; State ex rel. Adam v. Martin, 198 Ind. 516, 154 N.E. 284, 287.

[12] United States v. Throckmorton, 98 U.S. 61, 68, 25 L.Ed. 93; Chicago, R. I. & P. Ry. Co. v. Callicotte, 8 Cir., 267 F. 799, 803, 16 A.L.R. 386; Gray v. McKnight, 75 Okl. 268, 183 P. 489, 494; Freeman on Judgments, 5th Ed., Vol. 3, § 1233.

[13] United States v. Throckmorton, 98 U.S. 61, 65, 66, 25 L.Ed. 93; Farley v. Davis, 10 Wash.2d 62, 116 P.2d 263, 268, 155 A.L.R. 1302; Tankar Gas v. Lumber-

men's Mut. Casualty Co., 215 Minn. 265, 9 N.W.2d 754, 759, 146 A.L.R. 1223; Jacobson v. Brey, 72 N.D. 269, 6 N.W.2d 269, 273; Bodine v. Farr, Mo.Sup., 182 S.W.2d 173, 174; Mills v. Baird, Tex.Civ. App., 147 S.W.2d 312, 316, 317; Brown v. Trent, 36 Okl. 239, 128 P. 895, 898; Cochran v. Barkus, 112 Okl. 180, 240 P. 321, 322; Flood v. Templeton, 152 Cal. 148, 92 P. 78, 81, 13 L.R.A.,N.S., 579; Chamblin v. Chamblin, 55 Nev. 146, 27 P.2d 1061; Freeman on Judgments, 5th Ed., Vol. 3, § 1233.

[14] United States v. Throckmorton, 98 U.S. 61, 66; Mills v. Baird, Tex.Civ.App., 147 S.W.2d 312, 316; Jacobson v. Brey, 72 N.D. 269, 6 N.W.2d 269, 273; Gray v. McKnight, 75 Okl. 268, 183 P. 489, 494; Brown v. Trent, 36 Okl. 239, 128 P. 895, 898; Aetna Casualty & Surety Co. v. Abbott, 4 Cir., 130 F.2d 40, 43, 44; Freeman on Judgments, 5th Ed., Vol. 3, § 1233.

644

in their hands to the surviving heirs-at-law of Cussehta in accordance with such laws of descent and distribution, and should make all conveyances and do all other things necessary to vest such estate in such heirs.

The original trust instrument and the previous supplements thereto had provided for the reinvestment of the trust estate in Cussehta upon the expiration of the trust period. By the supplemental trust instrument of July 13, 1927, Cussehta, in effect, undertook to reserve a life estate in himself and to transfer the remainder to his heirs-at-law. At the time the supplemental trust instrument of July 13, 1927, was executed, Cussehta's beneficial interest in the portions of the allotments of Linda and Maley, which came to him by devise, was subject to the qualified restrictions imposed by § 9 of the Act of May 27, 1908, as amended by the Act of April 12, 1926. We are of the opinion that the supplemental trust instrument of July 13, 1927, amounted to a conveyance of an interest in restricted lands within the meaning of § 9, as amended, and that such supplemental trust instrument was invalid because it was not approved by the county court having jurisdiction of the settlement of the estates of Linda and Maley.[15]

Cussehta died leaving as his only heirs-at-law Nancy and Lessey. If such supplemental trust instrument was invalid, then the interest of Cussehta in the allotments passed to Nancy and Lessey by virtue of the laws of descent and distribution of Oklahoma, and the lands remained subject to the qualified restrictions imposed by § 9, as amended, in the hands of Nancy and Lessey.[16]

The United States was not a party to the proceeding in the county court of Okfuskee County, in which it was adjudged that the property in Cussehta's trust passed to Nancy and Lessey by virtue of the supplemental trust instrument of July 13, 1927, and, therefore, was not bound by that adjudication.[17] For like reasons, the United States was not bound by the judgment of the district court of Muskogee County in cause No. 9424. And it is well settled that, though the Indian's interest in restricted land is alienated by judicial decree, the United States may sue to cancel the judgment and set aside the conveyance where it was not a party to the action.[18] Moreover, Nancy and Lessey were not bound by the judgment of the county court of Okfuskee County adjudging that Cussehta's interest in the allotments of Linda and Maley passed to them by virtue of the supplemental trust instrument of July 13, 1927, since that judgment undertook to validate a void conveyance of restricted lands.[19]

V.

We deem it unnecessary to determine whether Cussehta was incompetent as that phrase is used in 58 O.S.1941 §§ 851, 852. A competent person may be defrauded. The vital question is whether he was the victim of the intrigue of House, Lake Moore, Hill Moore, Grayson, and D. W. Johnston. The evidence established these facts: At the time the order was entered adjudging Cussehta incompetent, he was approximately 55 years of age; at the time the order was entered restoring him to capacity, he was approximately 62 years of age. He was unable to speak the English language and was unable to read or write in any language; he was wholly inexperienced in the handling of property of large value or in the investing of funds of substantial amount. He had little notion of the value of money and cared little about

15 Cf. Tiger v. Sellers, 10 Cir., 145 F.2d 920, 922, 923.

16 See Grisso v. United States, 10 Cir., 138 F.2d 996, 1000.

17 United States v. Hellard, 322 U.S. 363, 64 S.Ct. 985, 88 L.Ed. 1326; State of Minnesota v. United States, 305 U.S. 382, 386, 59 S.Ct. 292, 83 L.Ed. 235; Town of Okemah v. United States, 10 Cir., 140 F.2d 963.

18 United States v. Hellard, 322 U.S. 363, 366, 64 S.Ct. 985, 88 L.Ed. 1326;

Bowling and Miami Investment Co. v. United States, 233 U.S. 528, 534, 535, 34 S.Ct. 659, 58 L.Ed. 1080; Privett v. United States, 256 U.S. 201, 204, 41 S. Ct. 455, 65 L.Ed. 889; Sunderland v. United States, 266 U.S. 226, 232, 45 S.Ct. 64, 69 L.Ed. 259; Heckman v. United States, 224 U.S. 413, 32 S.Ct. 424, 56 L.Ed. 820.

19 See Goodrum v. Buffalo, 8 Cir., 162 F. 817.

money. He had little or no realization of the value of his estate or the value of services rendered to him with respect thereto. He was subject to imposition by artful and designing persons. He reposed confidence in House, Lake Moore, Hill Moore, Grayson, and D. W. Johnston. He was readily influenced by their advice and suggestions. He accepted the reports made to him by the trustees without question and approved them without inquiry or without any knowledge with respect to their completeness and accuracy. The evidence further established that House, Hill Moore, and Grayson entered into a scheme to obtain control and management of Cussehta's estate, with the design and purpose of deriving improper personal advantage and gain therefrom; that they, and persons acting in their behalf, induced Cussehta to execute the original trust instrument and the instruments supplemental thereto, and to place such estate under the control and management of Hill Moore, Grayson, and House; that later, D. W. Johnston entered into such scheme; that House, Hill Moore, Grayson, and D. W. Johnston fraudulently induced Cussehta to agree to pay, and to pay unconscionable and exorbitant fees to the trustees, and fraudulently induced Cussehta to execute acceptances of reports by the trustees which purported to discharge the trustees and the sureties on their bonds from liability for the acts of the trustees; that the trustees made loans to Lake Moore, father of Hill Moore, which were not repaid, and failed to collect loans made by the trustees to D. W. Johnston; that the trustees made reports to Cussehta which were false and incomplete; and that D. W. Johnston and Grayson made a report to Nancy and Lessey which was false and incomplete; and that, in so doing, the trustees violated their fiduciary obligations to Cussehta, Nancy, and Lessey.

 We are of the opinion that, under the evidence presented, the United States was entitled to an accounting from the trustees with respect to the interests in the allotments of Maley and Linda which passed to Cussehta and later to Nancy and Lessey, and that the other plaintiffs below were entitled to an accounting from the trustees with respect to the trust estate, and that on an accounting, the court should scrutinize the administration of the trust estate by the trustees, should require the repayment by the trustees of the exorbitant and unconscionable fees charged by them, and should determine their liability for breaches of their fiduciary duties and for maladministration of the trust estate. We are further of the opinion that D. W. Johnston is liable to the plaintiffs below, other than the United States, upon the loans made to him by the trustees which he failed to collect after he became trustee and which he omitted from his final report made to Nancy and Lessey.[20]

### VI.

 House was admitted to practice before the Supreme Court of Oklahoma and the inferior courts of that state. He entered into a contract with Cussehta to pay him 10 per cent of the value of Cussehta's estate for bringing about Cussehta's restoration to capacity at a time when Cussehta was under an adjudication of incompetency. That contract was void under 15 O.S.1941 § 24. At a time when House was acting as confidential agent and advisor of Cussehta, House induced Cussehta to deliver to him, pursuant to such contract, securities of the value of $30,600, without advising Cussehta that the contract was void and unenforceable. The amount of the fee was exorbitant and unconscionable. We are of the opinion that House violated the confidence reposed in him by Cussehta, and fraudulently obtained from Cussehta, $30,600 in securities, and that the plaintiffs below are entitled to recover from House the value of such securities.

### VII.

 The evidence wholly failed to establish that Martin, McKinney, Randles,

[20] It is true that D. W. Johnston testified that Cussehta came to his office and requested him to act as trustee; that he told Cussehta he could not because he was indebted to the trust; and that two or three days later, Lessey and Cussehta came back and Lessey told Johnston that Cussehta wanted him to take the trusteeship and that he would cancel Johnston's indebtedness to the trust. But, at that time, Johnston's notes were held by the trustees and Cussehta was without power to cancel or discharge them.

646

Chowning, or the Okemah National Bank had any knowledge of the conspiracy to defraud Cussehta, or that any of them participated in the fraud on Cussehta or had any knowledge of such fraud.

Whether Martin, Lake Moore, and McKinney are liable as sureties on the bond of the trustees, Hill Moore and Grayson, we cannot determine from this record.

The judgment as to Shell, Randles, Chowning, and the Okemah National Bank ·is affirmed. The judgment as to Martin, Lake Moore, and McKinney is vacated. The judgment as to the other defendants is reversed and the cause is remanded, with instructions to overrule the motion to dismiss, and to proceed further in conformity with this opinion.

On Petition for Rehearing.

The plaintiffs and intervenors below, appellants here, have filed petitions for rehearing.

Complaint is made that we misconceived and misstated the facts in certain particulars. From a labyrinthic record here presented, consisting of the pleadings below and oral evidence, many exhibits, the pleadings in a number of judicial proceedings in state courts, and evidence adduced in such proceedings, all put together in the record, with entire disregard of relationship and chronology, and in utter disorder, we undertook to determine and state the facts with accuracy.

In our principal opinion herein, we stated:

"Maley ad Linda executed oil and gas leases covering their respective allotments. Both leases were duly approved by the Superintendent of the Five Civilized Tribes and by the Secretary of the Interior. Each lease reserved a royalty of one-eighth of the proceeds derived from the sale of oil and gas produced, and pro-

vided that such royalty should be paid to the lessor and her successors in interest."

The leases were not offered in evidence below and are not in the record. Our statement was based on paragraph 49 of the amended complaint in intervention of the United States,[1] which superseded all other pleadings of plaintiffs and intervenors below. Paragraph 49 was admitted by the answer of the Shell Oil Company.[2] It is urged that we should have inferred the facts from statements made by counsel at the trial below. Such statements were not mentioned in the briefs of appellants, and the statement of facts in such briefs did not contain a record reference thereto. Counsel for plaintiffs and intervenors below stated at the trial that the leases required the payment of royalties to be made to the "Superintendent of the Agency." Counsel for Shell then stated that, prior to the creation of the trusts, the Secretary of the Interior released supervision over the royalties. It was then stipulated that such statements were true.

Whether the Secretary of the Interior released the royalties from supervision and authorized them to be paid directly to the allottees and their successors in interest by approving provisions to that effect in the original leases, or whether, after the original leases were executed and before the royalties here in question were paid, the Secretary of the Interior released the royalties from supervision and authorized their payment directly to the allottees and their successors in interest, we regard as wholly immaterial, because in either event the result would be the same.

The lands allotted to Linda and Maley were restricted against alienation until the death of the allottees. Linda died October 11, 1916. Maley died May 3, 1917. Since the interests in the allotments here involved passed, not by inheritance, but by

[1] Paragraph 49 in part reads:
"That * * * Shell Oil Company, * * * on April 28, 1924, and at all other times mentioned herein, was engaged in mining and producing oil and gas from the allotment of Linda Yarhola, * * * and the allotment of Maley Fiers, * * * that the mining and production of said gas and oil was under leases executed by the allottees of such lands, duly and lawfully approved by the Superintendent of the Five Civilized Tribes Agency and by the Secretary of the Interior of the United States; that a one-eighth (⅛) royalty upon the sales of gas and oil produced from said lands was to be paid to the allottees of said lands and their successors in interest, including the said Cussehta Yarhola, as a devisee of said lands."
[2] Hereinafter called Shell.

devise to Cussehta, they were free from restrictions against alienation from the respective dates they passed to Cussehta until the Act of April 12, 1926, 44 Stat. 239, became effective. On April 12, 1926, Cussehta's interest in the allotted lands became subject to the qualified restrictions imposed by § 9 of the Act of May 27, 1908, 35 Stat. 312, as amended by such Act of April 12, 1926. Hence, since the supplemental trust instrument of July 13, 1927, undertook to convey the remainder estate of Cussehta, and such instrument had not been approved by the county courts having jurisdiction of the estates of Linda and Maley, it was void.

Whether a conveyance of future royalty payments under leases made by Cussehta after April 12, 1926, if not approved by the proper county courts, would have been void, is not here presented. The supplemental trust instrument of July 13, 1927, was void, and it did not affect prior trust instruments. The royalty payments under the leases had been effectually transferred to the trustees by Cussehta by the trust instruments executed and delivered prior to April 12, 1926, during a period of time when counsel for plaintiffs and intervenors below expressly admit Cussehta's interest in the allotments and the royalties were free from restrictions against alienation.

While qualified restrictions against alienation of allotted lands in the hands of full-blood Indian heirs or full-blood Indian devisees of the allottees are imposed by § 9 of the Act of May 27, 1908, as amended, restrictions with respect to the receipt of payment of royalties and accumulated royalties under leases of restricted lands are imposed solely by the regulations promulgated by the Secretary of the Interior under § 2 of the Act of May 27, 1908; and this is true with respect to lands subject to qualified restrictions under § 9 of the Act of May 27, 1908. Such was the holding of the Supreme Court in Parker v. Richard, 250 U.S. 235, 238–240, 39 S.Ct. 442, 63 L.Ed. 954.

In resolving the issue here presented, the distinction between restrictions imposed by statute against the conveyance of an interest in allotted lands passing by inheritance or devise to full-blood Indian heirs or devisees, and restrictions imposed by regulations of the Secretary of the Interior under § 2 of the Act of May 27, 1908, with respect to the receipt of payment of royalties under oil and gas leases must be clearly kept in mind. The former restricts only the right of the Indian owner to alienate any interest in the land; the latter restricts the right of the Indian owner and lessor to receive payment of royalties.

From the amended complaint in intervention of the United States, the answer of Shell, and the statements of counsel made in open court, it is clear that the Secretary of the Interior released the royalty payments from the restrictions imposed by the regulations promulgated by him pursuant to § 2 of the Act of May 27, 1908, and authorized their payment directly to the allottees and their successors in interest.

It follows from the foregoing, that from the time the interests in the allotted lands passed to Cussehta until April 12, 1926, he was authorized to transfer his interest in the royalties reserved under the leases to the trustees, and that the approval of such transfers by the proper county courts was not a prerequisite to their validity; that from the time the Secretary of the Interior released the royalties from supervision and authorized their payment directly to the lessors, until April 12, 1926, Cussehta, or his nominees, was entitled to receive his share of the royalty payments directly from the lessee; and that they were entitled to continue to receive the royalty payments after that date, unless the restrictions provided by the regulations promulgated by the Secretary of the Interior, which had been removed by the Secretary of the Interior, were reimposed.

While the Act of April 12, 1926, imposed qualified restrictions against the alienation of Cussehta's interest in the allotments, such Act did not reimpose, with respect to the payment of royalties under such leases, the restrictions provided by the regulations promulgated by the Secretary of the Interior. The statute dealt solely with restrictions against alienation. It in no sense impinged on the right to receive payment of royalties under oil and

648

gas leases. The restrictions with respect to the payment of such royalties, under the regulations promulgated by the Secretary of the Interior, had been removed by him, and could only be reimposed by action taken by him. It may be that when the lands again became restricted, the Secretary of the Interior could have promulgated a regulation restricting the payment of royalties under such leases, but he did not do so. Clearly, a statute, which merely placed Cussehta's interest in the allotments in such a status as to authorize the Secretary of the Interior by regulation to impose restrictions with respect to oil and gas leases and the receipt of payment of royalties thereunder, would not have the effect of reimposing restrictions with respect to the receipt of payment of royalties which had theretofore been removed by the Secretary of the Interior under authority given him by the Act of May 27, 1908.

We adhere to the conclusion that the trustees were entitled to receive, directly from Shell, Cussehta's share of the royalty payments.

The petitions for rehearing are denied.