R. E. HOOD, Appellant,

v.

Ruby Gay HOOD, Appellee.

No. 7556.

United States Court of Appeals
Tenth Circuit.

Aug. 6, 1964.

Certiorari Denied Nov. 16, 1964.
See 85 S.Ct. 263.

Lewis, Circuit Judge, dissented.

Wayne Coulson, Wichita, Kan. (Paul R. Kitch, Dale M. Stucky, Donald R. Newkirk, Robert J. Hill, Gerrit H. Wormhoudt, Philip Kassebaum, John E. Rees and Robert T. Cornwell, Wichita, Kan., on the briefs), for appellant.

Robert Martin, Wichita, Kan. (Sam Riggs, Jr., Liberal, Kan., George B. Collins, Oliver H. Hughes, K. W. Pringle, Jr., W. F. Schell, Robert M. Collins, William L. Oliver, Jr., Wichita, Kan., Thomas M. Burns, Denver, Colo., and Laverne

Morin, Wichita, Kan., on the brief), for appellee.

Before PHILLIPS, LEWIS and BREITENSTEIN, Circuit Judges.

PHILLIPS, Circuit Judge.

R. E. Hood and Ruby Gay Hood were husband and wife. Their marriage was dissolved by a decree granting her a divorce. Prior to the divorce, they entered into a property settlement agreement. Mrs. Hood brought this action against Hood to recover damages for deceit, alleging that she was induced by fraud practiced upon her by Hood to enter into the property settlement agreement. From a judgment for Mrs. Hood, he has appealed.

The facts appear in the record only in the findings of the trial court, which are not challenged.

The Hoods were married in March, 1940. Two children were born of the marriage, a son 18 years of age and a daughter 3 years of age at the time of the divorce in January, 1960.

During several years prior to the divorce the Hoods had experienced marital difficulties. In June, 1959, Mrs. Hood decided to seek a legal separation from her husband. They then resided at Liberal, Kansas. About the middle of that month, she consulted a member of the Kansas bar, who was a near neighbor of the Hoods and who for several years had served as legal counsel for Hood, his father, and other members of the family. She told the lawyer she had determined to obtain a legal separation from her husband. The lawyer advised her that an action for separate maintenance would be unwise and not for the best interests of Hood in his business, and that if she was determined to separate from him permanently, it would be better for them to be divorced. She agreed to follow his advice and asked him to contact Hood with respect to an immediate separation. On several occasions during the ensuing two weeks, Mrs. Hood conferred with the lawyer at his office. He did not advise her as to her legal rights and Hood's

obligations with respect to a division of their property. He did advise her it would be better for them to agree on a division of their property and the custody of their children.

A few days prior to June 29, 1959, Hood, who also had consulted the lawyer, came to the home and told Mrs. Hood he was there to work out an agreement on the division of their property. In her presence he wrote out a financial statement, which he represented to her to be an accurate and complete disclosure of the nature, extent, and value of their property and their net worth, which the statement indicated was $288,000. He also told Mrs. Hood that he owned three quarter sections of land, which were a gift to him from his father, and that the lawyer had advised him "he did not have to divide with her." Originally, he proposed a property settlement on the basis of one-half of the net value, or $144,000, to each. Mrs. Hood agreed to the proposal. Under it, the home was to be conveyed to her as a part of her share. On the following day, Hood returned to the home and informed Mrs. Hood the lawyer had advised him he would be unable to pay her $94,000 over and above the agreed value of the home, because of his tax liabilities, and prevailed upon her to agree to accept $60,000 in addition to the home as a full settlement and division of their property.

On June 29, 1959, Hood and Mrs. Hood met at the office of the lawyer. The lawyer prepared a property settlement stipulation based on the oral agreement which they had reached, under which the home was to be conveyed to Mrs. Hood and Hood was to pay her $60,000 in installments, and it further provided that Mrs. Hood should receive the household furniture and furnishings in the home, one share of stock in a country club, personal jewelry, clothing, and other personal effects, and she was to retain all interest in real estate or mineral rights conveyed to her by her parents and to which she held title. It also provided for child support for the minor daughter and for her custody. In the

stipulation it was provided that the action should not be set for trial on the divorce issue until one year from the date of the stipulation, but that the provisions thereof with respect to the property settlement should become "fully effective" as soon as "approved by the Court"; that the parties should execute all necessary conveyances to carry it into effect, and that the stipulation should be made a part of the court's final judgment and decree, settling and determining the respective property rights of the parties. The Hoods executed the stipulation. The lawyer also prepared a petition for divorce by Hood against Mrs. Hood and an entry of appearance in the action by Mrs. Hood, which she signed, and on the same day the petition and entry of appearance were filed in the District Court of Seward County, Kansas.

On July 7, 1959, the lawyer presented the property settlement stipulation to the Judge of the District Court of Seward County, Kansas, who noted his approval of the stipulation in the margin thereof. That was done without a hearing, without any evidence, and without the presence or knowledge of Mrs. Hood. The divorce proceeding remained in that posture for about six months and during that period the Hoods remained separated.

In January, 1960, Mrs. Hood went to the office of the lawyer and told him that since Hood had continued in the conduct which caused her to demand a separation, she desired and insisted on an immediate hearing of the divorce action. The lawyer, who, for clarity, we will hereafter refer to as Hood's lawyer, advised Mrs. Hood he was Hood's attorney and could not represent her and that she would have to obtain the services of another lawyer. After some discussion, they agreed on another lawyer to represent her. Hood contacted such other lawyer, hereinafter referred to as Mrs. Hood's lawyer, and he agreed to represent her. Hood's lawyer advised Mrs. Hood's lawyer the parties had agreed on a property settlement and support money for and custody of the minor daughter,

and that the divorce could be obtained by default upon a cross-petition of Mrs. Hood. Hood's lawyer prepared an answer and cross-petition and Mrs. Hood and her lawyer signed it. It was filed January 15, 1960, and on the following day the divorce action came on for hearing.

Prior thereto, Mrs. Hood had conferred with her lawyer, but solely as to matters relating directly to the divorce action. At the conference there was no discussion of the value or extent of the Hood's property, of the financial statement, or any other pertinent documents, nor any facts relating to their property or a division thereof between them. Mrs. Hood received no counsel or advice from her lawyer with respect to those matters.

Mrs. Hood and a corroborating witness for her appeared and testified at the divorce hearing. Hood did not appear, but was represented by his lawyer. Neither the financial statement prepared by Hood at the time of the oral agreement, as to the property settlement, nor any other financial statement or pertinent document was presented to the trial judge, nor was any evidence presented as to whether the property settlement was fair, equitable, freely made, without fraud or overreaching, nor was any evidence offered as to what extent, if any, Mrs. Hood had the advice of independent counsel with respect to the property settlement. On the same day that the divorce action was heard, the court entered a decree which granted Mrs. Hood a divorce. The decree recited that the stipulation had been filed in the cause and stated:

"It Is Therefore By The Court Ordered, Adjudged And Decreed * * * that such stipulation be entered on the journal and be a part of this judgment.

"It is further ordered, adjudged and decreed that the parties be and are hereby directed to carry out and perform all of the provisions of such stipulation which have not already been done and performed, and to carry out and perform the stipulation

made in Court this day as previously recited herein, and that each of the parties be barred, foreclosed and excluded from any claim or demand against the other or the others property or estate, except as provided in such stipulations * * *."

The trial court did not specifically find which of the lawyers drafted the final decree in the divorce action. However, because of the fact that Hood's lawyer drafted every other writing filed in such action, including Mrs. Hood's answer and cross-complaint, which sought only a divorce, and because of the language of the decree relating to the property settlement, we entertain no doubt that he also drafted the decree to be the final step in Hood's fraudulent plan to obtain a binding property settlement that would be grossly unfair to Mrs. Hood.

At the time the representations above set forth were made to her by Hood; at the time she entered into oral agreements with Hood with respect to a property settlement; at the time she executed the stipulation; and at the time of the divorce hearing, Mrs. Hood knew little or nothing about her husband's business affairs and the properties acquired and controlled by him during their married life, and she believed and relied upon the financial statement and the oral statements and representations made to her by Hood, as to the value and extent of their property and their indebtedness.[1] She was not afforded the advice and counsel of an independent lawyer, responsible to her, and she was deprived of any opportunity for a fair and full investigation with respect to such property and indebtedness.

With the exception of a single quarter section of land, Hood substantially and in some instances grossly understated the value of the assets and property in the financial statement and in the oral representations he made to Mrs. Hood with

respect thereto, and he entirely omitted some of his assets from such statement and overstated therein his personal indebtedness by approximately $47,000.

Hood, at all times material herein, was a successful and astute businessman, who, during the period of the marriage, had built and accumulated a very substantial estate. He could easily have obtained a financial statement from his bookkeepers or accountants, which would have reflected the true and fair value of such estate and the indebtedness owed by him. He knowingly and deliberately understated the assets and overstated the liabilities to his wife.

Certain television properties were listed in the financial statement at a value of $140,000. Within three months after the divorce was granted, Hood had arranged the sale of such properties for a price of $625,000, and at the time of the divorce action he had made arrangements to obtain an independent evaluation and approval of the sale of such properties. These television properties, which were jointly acquired by the Hoods, were grossly undervalued by Hood in his representations to his wife, with full knowledge on his part of the fair value thereof.

Evidence of the net taxable income from the television properties, and of the net taxable income attributable to Hood personally and to "inside" corporations which he owned or controlled, established and confirmed that the fair values of his properties were greatly in excess of the values he represented to his wife, and that he so knew at the time he made such representations.

The trial court awarded Mrs. Hood judgment for $125,000. Hood has appealed.

The only defense to Mrs. Hood's action urged below that is here relied on is that the divorce decree was a bar to Mrs. Hood's action.

1. That Mrs. Hood imposed explicit trust and confidence in her husband is confirmed by the fact that on July 29, 1959, she executed a will drafted by Hood's lawyer, in which she designated Hood

and such lawyer as coexecutors and trustees, with broad powers of management of her estate, including the power to compromise claims of the estate.

It will be observed that while under the terms of the stipulation the trial of the divorce issue was postponed for a year, the provisions of the stipulation with respect to the property settlement upon approval by the court, without more, and without the incorporation thereof in any order or decree of the court, were to become immediately effective and operative on the parties and required them to make the necessary conveyances to carry it into effect.

We are of the opinion that it was the intent of Hood and Mrs. Hood that the property settlement should be approved by the state court, without any inquiry or determination by the judge thereof as to the extent or value of their property, as to the indebtedness of Hood, or as to the fairness of the property settlement, and that the parties tacitly so agreed. It was so construed by counsel for Hood when he presented it for ex parte approval by the state court judge and by the judge when he so approved it on July 7, 1959.

We conclude that it was the design and purpose of Hood, by the false representations made by him to Mrs. Hood with respect to the extent and value of the property and his indebtedness, to induce her to enter into the stipulation and to consent that it might be approved by the state judge, without any inquiry or determination as to the extent or value of their property and his indebtedness, or as to the fairness of the agreed property settlement, and that it should become immediately effective on such approval; and further, that it was the design and purpose of Hood by such false representations to cause Mrs. Hood not to seek the advice of independent counsel with respect to whether the property settlement was fair, just and equitable as to her, and to cause her not to seek in

the divorce proceeding an inquiry and determination by the court as to whether the property settlement was fair, just and equitable as to her, and through a continuance of such deception to cause her not to challenge the fairness of the property settlement in her cross-complaint or at the divorce hearing, and that such design and purpose was fully accomplished by Hood by such fraudulent representations. There can be no doubt if such an inquiry had been made by the court in the divorce proceeding and Hood had made a full and truthful disclosure as to their property, the court would have set aside its approval of the property settlement and disapproved the same.

It is the public policy of Kansas to encourage parties experiencing marital difficulties to settle their respective property rights by voluntary agreements,[2] and it is the tendency of the Kansas courts to approve and carry out property settlements agreed to by the parties.[3]

Kansas does not follow the law of some jurisdictions that the incorporation of a property settlement contract in a decree by making it a part thereof gives the contract the status of a court decree that can be enforced only by an order of the court, for the reason that such a rule tends to discourage "the solution of marital difficulties by contract rather than by recourse to the courts."[4]

A separation agreement approved by the court and incorporated in its decree will not be regarded as merged in the decree "in the absence of clear and unequivocal language requiring that conclusion. Even then it is by no means certain it can be said or held that such agreement is extinguished to the extent its contractual provisions are no longer binding upon the parties."[5] That is especially true where there was no in-

2. In re Shideler's Estate, 172 Kan. 695, 242 P.2d 1057, 1060; Petty v. Petty, 167 Kan. 510, 207 P.2d 428, 433.

3. Petty v. Petty, 167 Kan. 510, 207 P.2d 428, 433.

4. Petty v. Petty, 167 Kan. 510, 207 P.2d 428, 433; In re Shideler's Estate, 172 Kan. 695, 242 P.2d 1057, 1060.

5. French v. French, 171 Kan. 76, 229 P. 2d 1014, 1018; In re Shideler's Estate,

quiry by the court with respect to the fairness and reasonableness of the property division and no finding by the court on evidence adduced that the division was fair, equitable and reasonable.[6]

Here, that portion of the stipulation with respect to the property settlement by its express terms became fully effective, operative and binding on the parties when it was approved by the trial court on July 7, 1959. It required no decree of the court to give it full and immediately operative effect. We are of the opinion, that under the decisions of the Supreme Court of Kansas, the decree entered more than six months after the property settlement agreement became effective should not be construed to have the effect of canceling and wiping out the property settlement part of the stipulation as an operative contract and merging it in the decree.

Moreover, the instant action is neither an action to set aside the property settlement agreement nor the decree of the court. On the contrary, it affirms the contract, and is a tort action for deceit seeking damages from Hood on account of the fraud practiced on Mrs. Hood by him. An action to recover damages for fraud inducing a contract is founded on tort and not on the contract and proceeds on the theory of affirmance of the contract fraudulently procured.[7]

It follows that the precise question here presented is whether the divorce decree is a bar to such an action. No issue was raised, presented, or decided in the divorce action as to whether Mrs. Hood was induced to enter into the contract and consent to its approval through fraud practiced upon her by Hood. Hence, the provision in the decree "that each of the parties be barred, foreclosed and excluded from any claim or demand against the other or the others property or estate, except as provided in such stipulations" was not an adjudication of that issue. It was merely a recital in substance of a provision of the stipulation.

But, even if the property settlement stipulation was merged in the judgment and the above language of the decree be regarded as an adjudication of that issue, Mrs. Hood, through the fraud practiced upon her by Hood, was induced to enter into the property settlement stipulation, to consent to its ex parte approval by the court without any inquiry as to whether it was fair, just and equitable, and to refrain from seeking the advice of independent counsel with respect to such property settlement and to refrain from seeking a full inquiry and determination by the court in the divorce proceeding as to whether the property settlement was fair, just and equitable as to her, and to refrain from questioning the fairness and reasonableness of the property division in the divorce proceeding. And if such fraud was extrinsic or collateral fraud, Mrs. Hood was entitled to equitable relief, precluding Hood from setting up the judgment as a defense to her action for fraud.[8]

We think it was extrinsic fraud. This court, in Chisholm v. House, 160 F.2d 632, 643, defined extrinsic fraud as follows:

" * * * Fraud is regarded as extrinsic or collateral where it prevents a party from having a trial or from presenting his cause of action or his defense, or induces him to withdraw a defense, or operates upon matters pertaining not to the judgment itself, but to the manner in which it was procured. * * *"

172 Kan. 695, 242 P.2d 1057, 1059; Petty v. Petty, 167 Kan. 510, 207 P.2d 428, 433, 434, 435.
See also: United States Nat. Bank of Denver v. Bartges, 120 Colo. 317, 210 P.2d 600, 604, 605, 606, c.d. 338 U.S. 955, 70 S.Ct. 493, 94 L.Ed. 589.

6. In re Shideler's Estate, 172 Kan. 695, 242 P.2d 1057, 1060; See Petty v. Petty,

167 Kan. 510, 207 P.2d 428, 433, 434, distinguishing Hullet v. Hullet, 133 Kan. 738, 3 P.2d 470, on that ground.

7. 37 C.J.S. Fraud § 63, pp. 352, 353; Chanin v. Chevrolet Motor Co., 7 Cir., 89 F.2d 889, 891; McWilliams v. Barnes, 172 Kan. 701, 242 P.2d 1063, 1065, 1066.

8. Chisholm v. House, 10 Cir., 160 F.2d 632, 643.

The Kansas courts have defined extrinsic fraud as "some act or conduct of the prevailing party which has prevented a fair submission of the controversy." [9]

In Prideaux v. Prideaux, 169 Kan. 644, 220 P.2d 538, 542, where the plaintiff, in an action to set aside a divorce decree, alleged that she had withdrawn her cross-petition for divorce and permitted her husband to obtain a divorce decree in reliance upon representations made to her by her husband that a property settlement entered into between them was fair, and that a stipulation settling the property rights was grossly unfair, the court held the complaint charged extrinsic fraud as a ground for setting aside the decree.

■ Accordingly, we conclude that the decree of divorce was not a good defense to the instant action and the judgment is affirmed.

LEWIS, Circuit Judge (dissenting).

I must respectfully dissent. Although it is clear from the case law of Kansas that it is the public policy of that state to encourage the independent settlement of property rights in divorce cases and to leave the enforcement of such agreements to the law of contracts, it is equally clear that jurisdiction of the property settlement may be retained in the divorce court by merger of the settlement in the decree. The intent to so merge will not be read into the decree absent clear and unequivocal language to that effect. In my opinion, the language contained in the decree at bar requires the conclusion that a merger was intended. The decree

not only recites that the agreement "be a part of the judgment" but contains a specific provision for enforcement of the agreement by both affirmative and negative orders directed to the parties. Such language seems entirely inconsistent with a contract deemed independent of the decree and over which the court would have no continuing jurisdiction. Unless the Kansas court intended that the property settlement be merged in the decree it could not order "that * * * the parties * * * carry out and perform all of the provisions of the stipulation * * *" nor bar the parties "from any claim or demand against the other * * * except as provided in the stipulations * * *."

Nor can I agree that the fraud indicated in the case at bar was extrinsic either traditionally or under Kansas law. Prideaux v. Prideaux, 169 Kan. 644, 220 P.2d 538, is distinguishable. There Mrs. Prideaux was induced to withdraw an affirmative claim, to abandon a defense and to submit to a default. She was, in effect, led right out of court. But in the case at bar Mrs. Hood appeared in the divorce court, was represented by counsel, testified in person, called a witness in her behalf and sought and obtained a decree of divorce and other relief.[1] Mr. Hood's unconscionable conduct induced her to agree to and present to the divorce court for approval a settlement of property rights; the other inducements stated in the prevailing opinion, and there properly qualified, are not specifics. Had Mr. Hood given undisputed but perjured testimony at the

9. Lowry v. Lowry, 174 Kan. 526, 256 P. 2d 869, 870; Prideaux v. Prideaux, 169 Kan. 644, 220 P.2d 538, 542.

1. The state court record states:
"Now on this 16th day of January, 1960 a regular day of this January term Plaintiff appears by Chas. Vance, his attorney and Defendant appears in person and by Rex Neubauer, her attorney.
"Both parties agree that the case should be tried at this time. Plaintiff offers evidence and rests and Defendant offers evidence and the cause is argued by the attorneys. The Court being fully

advised in the premises finds that Plaintiff has been guilty of extreme cruelty and Defendant is entitled to a divorce and that the settlement of their property rights and the custody and support of their minor child, which stipulation should be made a part of judgment of this Court."
The federal trial court found:
"The wife appeared at the divorce case in person with her attorney and a corroborating witness. The husband did not appear, but his attorney Charles Vance, was present."

trial Mrs. Hood would have been victimized to the same extent.

I would hold that the instant action, though couched in terms of tort, is actually a collateral attack upon a state judgment and, as such, prohibited both under state and federal law. McCormick v. McCormick, 82 Kan. 31, 107 P. 546; Murrell v. Stock Growers' Nat'l Bank, 10 Cir., 74 F.2d 827. Relief from Mr. Hood's fraud should be left to the state court in which it warped the judicial process.